No. 22-1279

# United States Court of Appeals for the Fourth Circuit

CARLTON & HARRIS CHIROPRACTIC, INC.,
a West Virginia Corporation, individually and as the
representative of a class of similarly-situated persons

Plaintiff-Appellant,

v.

PDR NETWORK, LLC; PDR DISTRIBUTION, LLC;
PDR EQUITY, LLC; JOHN DOES 1-10,

Defendants-Appellees.

On Appeal from the United States District Court for the
Southern District of West Virginia (at Huntington), No. 3:15-cv-14887
Hon. Robert C. Chambers

## BRIEF FOR APPELLEES

Jeffrey N. Rosenthal
BLANK ROME LLP
130 N. 18th Street
Philadelphia, PA 19103
(215) 569-5553

Ana Tagvoryan
BLANK ROME LLP
2029 Century Park East
6th Floor
Los Angeles, CA 90067
(424) 239-3400

Carter G. Phillips
Kwaku A. Akowuah
Alice A. Wang
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
kakowuah@sidley.com

*Counsel for PDR Network, LLC, et al.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>22-1279</u>    Caption: <u>Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>PDR Network, LLC; PDR Distribution, LLC; PDR Equity, LLC; John Does</u>
(name of party/amicus)

_____

 who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☑YES ☐NO
      If yes, identify all parent corporations, including all generations of parent corporations:

       Defendant-Appellee PDR Distribution, LLC's parent corporation is PDR, LLC;
       Defendant-Appellee PDR Equity LLC's parent corporation is PSKW Holdings, LLC;
       Defendant-Appellee PDR Network LLC's parent corporation is PDR, LLC

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Kwaku A. Akowuah                    Date:    June 24, 2022

Counsel for:    PDR Network, LLC; PDR Distribution, LLC; PDR Equity, LLC; John Does

Print to PDF for Filing

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................ i

TABLE OF AUTHORITIES .................................................. iv

INTRODUCTION ............................................................1

COUNTERSTATEMENT OF THE ISSUES ...........................................6

STATEMENT OF THE CASE ...................................................7

SUMMARY OF ARGUMENT .................................................17

STANDARD OF REVIEW ....................................................21

ARGUMENT ...............................................................22

I.    The District Court Correctly Held That The TCPA's Definition Of The Term "Unsolicited Advertisement" Is Unambiguous And Satisfied Only By Communications Encompassing an Intent To Sell. ...................23

II.    The FCC's 2006 "Free Goods and Services" Interpretation Is Not Entitled to *Skidmore* Deference Even If the Statute Is Deemed Ambiguous. ...........................................................33

    A.    The Commission Failed To Explain How A *Per Se* Rule Follows From the Text of the Statute Or Is Consistent With Other Statements Within The Same 2006 Publication. ........................................34

    B.    The "*Per Se*" Construction of the 2006 Interpretive Statement Is Not Entitled To *Skidmore* Deference Because It Is Inconsistent With Other Commission Statements. ..............................................36

III.    The District Court Correctly Determined That Plaintiff's Amended Complaint Failed To Allege Facts Sufficient To Establish That PDR's Fax Is An "Unsolicited Advertisement." ....................................44

CONCLUSION ...............................................................53

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Addison Automatics, Inc. v. RTC Grp., Inc.*,
No. 12 C 9869, 2013 WL 3771423 (N.D. Ill. July 16, 2013) ............................ 47

*Ambassador Animal Hosp., Ltd. v. Elanco Animal Health, Inc.*,
No. 20-CV-2886, 2021 WL 633358 (N.D. Ill. Feb. 18, 2021) .................... 45, 50

*ARcare v. IMS Health, Inc.*,
No. 2:16CV00080 JLH, 2016 WL 4967810 (E.D. Ark. Sept. 15,
2016) ............................................................................................................. 45

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................... 22

*Barr v. Am. Ass'n of Political Consultants, Inc.*,
140 S. Ct. 2335 (2020) .................................................................................. 32

*Bd. of Trs. of State Univ. v. Fox*,
492 U.S. 469 (1989) ...................................................................................... 30

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................... 22

*Bruce Katz, M.D., P.C. v. Focus Forward, LLC*,
22 F.4th 368 (2d Cir. 2022) (per curiam) ...................................................... 24

*Carlton & Harris Chiropractic, Inc. v. PDR Network LLC*,
883 F.3d 459 (4th Cir. 2018), *vacated*, 139 S. Ct. 2051 (2019) ................ 3, 8, 32

*Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*,
982 F.3d 258 (4th Cir. 2020) ....................................................... *passim*

*Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*,
No. CV 3:15-14887, 2016 WL 5799301 (S.D.W. Va. Sept. 30,
2016), *vacated*, 883 F.3d 459 (4th Cir. 2018) ................................................ 7, 8

*Clark v. Martinez*,
543 U.S. 371 (2005) ................................................................................. 27, 41

iv

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
   139 S. Ct. 1507 (2019) ...................................................................32, 41

*Destination Ventures, Ltd. v FCC*,
   46 F.3d 54 (9th Cir. 1995) ..............................................................26, 32

*Drug Reform Coordination Network, Inc. v. Grey House Publ'g, Inc.*,
   106 F. Supp. 3d 9 (D.D.C. 2015)....................................................26, 45

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades
   Council*,
   485 U. S. 568 (1988).......................................................................31, 32

*Facebook, Inc. v. Duguid*,
   141 S. Ct. 1163 (2021)..........................................................................29

*Fam. Health Physical Med., LLC v. Pulse8, LLC*,
   No. CV SAG-21-2095, 2022 WL 596475 (D. Md. Feb. 28, 2022),
   *appeal docketed*, No. 22-1393 (4th Cir. Apr. 12, 2022)......................25

*Florence Endocrine Clinic, PLLC v. Arriva Med., LLC*,
   858 F.3d 1362 (11th Cir. 2017) ........................................2, 17, 28, 40

*Grayson O Co. v. Agadir Int'l LLC*,
   856 F.3d 307 (4th Cir. 2017) .......................................................48, 49

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019)..........................................................................23

*Long v. United States*,
   199 F.2d 717 (4th Cir. 1952) ...............................................................29

*N.B. Indus., Inc. v. Wells Fargo & Co.*,
   465 F. App'x 640 (9th Cir. 2012) ............................................1, 28, 40

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*,
   139 S. Ct. 2051 (2019)............................................................................9

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*,
   139 S. Ct. 478 (2018)..............................................................................8

*Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharms., Inc.*,
   847 F.3d 92 (2d Cir. 2017) ...........................................................*passim*

*Physicians HealthSource, Inc. v. MultiPlan Servs., Corp.*,
  No. CIV.A. 12-11693-GAO, 2013 WL 5299134 (D. Mass. Sept.
  18, 2013) ..........................................................................................45

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)..........................................................................32

*Robert W. Mauthe, M.D., P.C., v. Nat'l Imaging Assocs., Inc.*,
  767 F. App'x 246 (3d Cir. 2019) ......................................................27

*Robert W. Mauthe, M.D., P.C. v. Optum Inc.*,
  925 F.3d 129 (3d Cir. 2019) ......................................................*passim*

*Rockville Cars, LLC v. City of Rockville*,
  891 F.3d 141 (4th Cir. 2018) ............................................................21

*Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.*,
  788 F.3d 218 (6th Cir. 2015) ....................................................*passim*

*SAS Inst., Inc. v. Iancu*,
  138 S. Ct. 1348 (2018)..............................................................23, 33

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  909 F.3d 635 (4th Cir. 2018) ............................................................35

*Sierra Club v. U.S. Dep't of the Interior*,
  899 F.3d 260 (4th Cir. 2018) ..............................................................4

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944)..................................................................13, 18

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)..........................................................................32

*St. Louis Heart Center, Inc. v. Forest Pharms., Inc.*,
  No. 4:12-CV-02224, 2013 WL 1076540 (E.D. Mo. Mar. 13, 2013) ................48

## Administrative Decisions

Notice of Apparent Liability for Forfeiture, *Presidential Who's Who
  dba Presidential Who's Who, Inc.*,
  25 FCC Rcd. 13759 (2010)..........................................................*passim*

Notice of Apparent Liability for Forfeiture, *Presidential Who's Who dba Presidential Who's Who, Inc.*,
26 FCC Rcd. 8989 (2011).....................................................................12, 19, 41

Notice of Proposed Rulemaking and Memorandum Opinion and Order, *Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
17 FCC Rcd. 17,459 (2002).......................................................................10, 37

Report and Order, *Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
18 FCC Rcd. 14,014 (2003)............................................................10, 19, 36, 38

Report and Order and Third Order on Reconsideration, *Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
21 FCC Rcd. 3787 (2006)..................................................................1, 7, 27, 35

Second Order on Reconsideration, *Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
20 FCC Rcd. 3788 (2005)...........................................................................11, 38

**Statutes**

47 U.S.C. § 227(a)(4).................................................................................35

47 U.S.C. § 227(a)(5)...........................................................................*passim*

47 U.S.C. § 227(b)(1).............................................................................7, 36

47 U.S.C. § 227(b)(2)...........................................................................10, 37

**Rule**

Fed. R. Civ. P. 8(a)...................................................................................22

**Other Authorities**

*Keyword Search: Physician's Desk Reference*, Chi. Pub. Libr.
https://www.chipublib.org/ (last visited June 24, 2022)....................................52

*Label for Adderall® CII*, FDA,
https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/01152 2s043lbl.pdf (last visited June 24, 2022)...........................................................53

*Label for KEYTRUDA®*, FDA,
    https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/12551
    4s096lbl.pdf (last visited June 24, 2022) ............................................................53

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal
    Texts* (2012) ........................................................................................................28

## INTRODUCTION

Taken down to the studs, this is a straightforward statutory interpretation case.  It centers on the proper interpretation and application of an express statutory definition that courts have interpreted in a broadly consistent manner for a decade. That consensus understanding is also in harmony with all relevant Federal Communications Commission ("FCC" or "Commission") pronouncements except arguably one—the Commission's 2006 interpretive statement that has been much discussed as this case has journeyed through the federal court system.[1]

The Telephone Consumer Protection Act ("TCPA") defines the term "unsolicited advertisement" to mean "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's express invitation or permission, in writing or otherwise."  47 U.S.C. § 227(a)(5).  As the district court observed, courts have long concluded that "[t]o be commercially available within the meaning of [this definition], a good or service must be available to be bought or sold (or must be a pretext for advertising a product that is so available)."  *N.B. Indus., Inc. v. Wells*

---

[1] We refer to the 2006 Order in its entirety as an "Order," consistent with its title. *See* Report and Order and Third Order on Reconsideration, *Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 21 FCC Rcd. 3787, ¶¶ 4, 52-53 & nn.185, 187 (2006) ("2006 Order").  In contrast, we refer to the paragraphs of the Order that discuss offers of free goods and services as the "2006 Interpretive Statement," consistent with the Court's conclusion regarding the legal character of those paragraphs in *PDR IV*.

*Fargo & Co.*, 465 F. App'x 640, 642 (9th Cir. 2012); *see also, e.g.*, *Florence Endocrine Clinic, PLLC v. Arriva Med., LLC*, 858 F.3d 1362, 1364 (11th Cir. 2017) ("Because the faxes do not promote the sale of Arriva products, the faxes are not unsolicited advertisements."); *Robert W. Mauthe, M.D., P.C. v. Optum Inc.*, 925 F.3d 129, 133 (3d Cir. 2019) ("'[T]he fax must convey the impression … that a seller is trying to make a sale,' [i]t is not enough that the sender sent a fax with a profit motive.") (citation omitted); *Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.*, 788 F.3d 218, 222 (6th Cir. 2015) ("[T]o be an ad, the fax must promote goods or services to be bought or sold, and it should have profit as an aim.").

The district court joined that consensus, reasoning that a communication that does not "offer something for sale" "does not constitute an advertisement under the TCPA." A045.

The district court then applied that standard to the amended complaint. Its allegations assert that plaintiff-appellant Carlton & Harris Chiropractic, Inc. ("Carlton") received from defendants-appellees (collectively, "PDR") a facsimile transmission offering a "FREE 2014 *Physicians Desk Reference* eBook" containing the "[s]ame trusted, FDA approved full prescribing information . . . [n]ow in a new, convenient digital format." A016-017 (Am. Compl. ¶¶ 12-13) (alterations in original); *see also* A017 (Am. Compl. ¶ 17 (acknowledging that the Physician's Desk Reference is "the most recognized drug information reference

available in the U.S.")).  Apart from the fax itself (A031), the Amended Complaint contains only a handful of case-specific allegations—essentially those in paragraphs 11 through 21 (A016-018).  Upon a careful review of those allegations and the complaint as a whole, the district court found there was no offer to sell, because "[w]hat the fax literally offers is a free and informational eBook," and that the Amended Complaint's various allusions to "an underlying and distant commercial purpose do[] not change that."  A045.  The district court accordingly held that the fax was not an "unsolicited advertisement," and thus not a communication prohibited by the TCPA.  This Court should adopt that straightforward interpretation and application of the statute and affirm the district court's judgment of dismissal.

In prior rounds at this Court, this case did not center on the text of the TCPA's "unsolicited advertisement" definition.  That is because Carlton's counsel, who was also counsel to the plaintiffs in *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 847 F.3d 92 (2d Cir. 2017), advanced the inventive but erroneous argument that a 2006 interpretive statement by the FCC regarding "offers for free goods and services and informational messages" was a "regulation" and, moreover, one that both the parties and the courts were bound to follow unquestioningly and without reference to the statutory text itself.  *See id.* at 95; *Carlton & Harris Chiropractic, Inc. v. PDR Network LLC*, 883 F.3d

459, 466-67 (4th Cir. 2018) ("*PDR II*").  It is now settled law, however, resulting

from this Court's prior review of the case, that "the 2006 FCC Rule is interpretive,

and so the district court wasn't bound by it."  *Carlton & Harris Chiropractic, Inc.

v. PDR Network, LLC*, 982 F.3d 258, 264 (4th Cir. 2020) ("*PDR IV*").  The only

ancillary question that now remains is whether the FCC's 2006 Interpretive

Statement is entitled to *Skidmore* deference.

      Carlton devotes less than 3 pages of its opening brief to that question, Br. 15-

17, and very little of that short passage discusses the relevant *Skidmore* factors:

"the thoroughness evident in [the FCC's] consideration, the validity of its

reasoning, its consistency with earlier and later pronouncements, and all those

factors which give it power to persuade," including the agency's consideration of

the "statutory text."  *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 288

(4th Cir. 2018) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Under those standards, the district court's decision to decline *Skidmore* deference

was clearly correct.  *Skidmore* deference is properly granted only to agency

interpretations that thoroughly expound on the text of the statute being interpreted,

are consistent with other relevant agency actions, and continue to be endorsed by

the agency.  To the extent it is read as propounding a *per se* interpretation, the

2006 Interpretive Statement fails each step of this test.  It does not examine the

statutory text or explain how a bespoke interpretation applicable only to offers of

4

free goods and services can be derived from its terms; it is inconsistent with a whole series of other FCC statements, issued both before and after 2006; and when the Commission appeared in this Court, it declined to defend or endorse Carlton's proposed *per se* construction of the 2006 Interpretive Statement. These considerations not only preclude granting *Skidmore* deference to the *per se* interpretation, but cast significant doubt on whether the FCC intended to offer any such categorical interpretation at all. As the district court incisively inferred, the greater likelihood is that the FCC was merely offering "advice" in the form of "generalized examples of behavior that is or is not covered," A042, and doing so in a manner that is consistent with the Commission's other relevant statements both in the 2006 publication and elsewhere: that *some* offers of free goods and services will qualify as "unsolicited advertisements." But certainly not all of them. It depends on whether the communication is attempting to sell something.

The bottom line is that in this case, as in all others governed by the text of Section 227(a)(5), the question to be answered on a Rule 12(b)(6) motion is whether the well-pleaded allegations of the complaint plausibly allege that the fax at issue was transmitted in an attempt to sell something. The district court answered just that question. It correctly held that Carlton's amended complaint does not satisfy that standard. Its judgment should be affirmed.

5

## COUNTERSTATEMENT OF THE ISSUES

1.     Whether the district court correctly interpreted the statutory term "unsolicited advertisement," as defined in 47 U.S.C. § 227(a)(5), to be limited to communications that attempt to make a sale.

2.     Whether the district court correctly declined to defer under *Skidmore* to a 2006 interpretive statement issued by the Federal Communications Commission, where (a) the statement reflected a "striking absence of reasoning regarding its categorical conclusion that faxes promoting goods and services even at no cost are unsolicited advertisements under the TCPA," A041; (b) the agency did not meaningfully connect its interpretation to the text of the statute; (c) the agency neither acknowledged nor explained inconsistencies between the 2006 Interpretive Statement and prior and subsequent agency actions interpreting the same provision of the same statute; and (d) the agency declined to endorse or defend its 2006 interpretation in prior briefing to this Court.

3.     Whether the district court correctly determined that Carlton's amended complaint failed to plausibly allege facts sufficient to establish that the fax message attached to the pleading—which offered a "free 2014 Physicians' Desk Reference eBook" containing the "[s]ame trusted, FDA-approved full prescribing information," "now in a new, convenient digital format"—is an "unsolicited advertisement," as that term is defined in 47 U.S.C. § 227(a)(5).

## STATEMENT OF THE CASE

This case arises out of a fax allegedly sent by PDR in 2013 to advise Carlton that the *Physician's Desk Reference*—a free reference book containing FDA-approved drug labeling for prescription drugs—could be obtained in a new, equally cost-free digital "eBook" format.  A016-017 (Am. Compl. ¶¶ 12-13); A031 (Ex. A, Am. Compl.).  Carlton filed this putative class action in 2015, alleging that the fax was an "unsolicited advertisement" sent in violation of the TCPA, 47 U.S.C. § 227(b)(1)(C).

The district court dismissed the original complaint because the "fax at issue here is not an 'advertisement' as defined by the TCPA."  *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, No. CV 3:15-14887, 2016 WL 5799301, at *3 (S.D.W. Va. Sept. 30, 2016) ("*PDR I*").  The district court held that the statutory definition of "advertisement" requires a "commercial element" that was missing from PDR's fax because PDR does not sell the reference book (which is free) or the prescription drugs whose labeling is compiled therein.  *Id.* at *3-5.  The court viewed its interpretation of the statute as consistent with that advanced by the FCC in a 2006 order that, in relevant part, discussed circumstances where fax messages offering free goods and services may be deemed to be "unsolicited advertisements."  *Id.* at *4-5; *see* Report and Order and Third Order on Reconsideration, *Rules and Regulations Implementing the Tel. Consumer Prot. Act*

7

*of 1991*, 21 FCC Rcd. 3787, ¶¶ 4, 52-53 & nn.185, 187 (2006) ("2006 Order").
The court added, however, that because the statute is "unambiguous" in requiring a
fax to be commercial in nature to be considered an advertisement, it would not be
"obliged to defer" to an agency interpretation. *PDR I*, 2016 WL 5799301 at *4.

Carlton appealed, and this Court reversed. This Court held that "the
jurisdictional command of the Hobbs Act" required the district court to apply the
FCC's interpretation of the term "unsolicited advertisement" in the 2006 Order
regardless of whether that interpretation is consistent with the statute, and indeed
without considering that question. *PDR II*, 883 F.3d at 466, *vacated*, 139 S. Ct.
2051 (2019). This Court further held that the district court erred in reading the
2006 Order as requiring "a fax to have some commercial aim to be considered an
'advertisement' for purposes of TCPA liability"; instead, this Court read the 2006
Order as creating a "prophylactic" rule that "faxes that offer free goods and
services are advertisements under the TCPA." *Id.* at 466-67.

PDR sought review from the Supreme Court, which granted certiorari to
consider "[w]hether the Hobbs Act required the district court in this case to accept
the FCC's legal interpretation of the [TCPA]." *PDR Network, LLC v. Carlton &
Harris Chiropractic, Inc.*, 139 S. Ct. 478 (2018) (unpublished table decision). The
Supreme Court vacated this Court's judgment and remanded for consideration of
two issues that it deemed "preliminary" to the Hobbs Act question: (1) whether the

2006 Order was a "legislative rule" with "the 'force and effect of law'" or instead "an 'interpretive rule'" that the district court "may not be required to adhere to," and (2) whether PDR had "a 'prior' and 'adequate' opportunity to seek judicial review of the Order" under the Hobbs Act. *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2055-56 (2019) ("*PDR III*") (quoting 5 U.S.C. § 703).

On remand, this Court instructed the parties to submit supplemental briefing on seven issues, including the two preliminary questions posed by the Supreme Court. The United States also participated as an amicus. The United States conceded that the relevant portion of the 2006 Order is indeed a non-binding interpretive rule, as the statements "discussing unsolicited fax advertisements do not invoke the Commission's rulemaking authority," and the FCC "did not purport to exercise that authority in connection with the relevant portion of the 2006 order." U.S. Br. 18, *PDR IV*, No. 16-2185 (4th Cir. Dec. 20, 2019). The parties also agreed that the relevant discussion in the 2006 Order is an interpretative statement.

PDR's supplemental briefing also demonstrated that reading the 2006 Interpretive Statement to mean that offers of free goods and services are always "advertisements" *per se* would be inconsistent with the FCC's earlier and later statements about the meaning of the same defined statutory term—"unsolicited

advertisement."  Several of those Commission statements concerned the use of that

term within a TCPA provision that regulates "robocalls"—that is calls "using an

artificial or prerecorded voice."  *See* 47 U.S.C. § 227(b)(2)(A).  In 2003, after

notice-and-comment rulemaking, the FCC stated:

> If the call is intended to *offer property, goods, or services*
> *for sale* either during the call, or in the future (such as in
> response to a message that provides a toll-free number),
> *that call is an advertisement*. Similarly, a message that
> seeks people to help sell or market a business' products,
> constitutes an advertisement if the individuals called are
> encouraged to purchase, rent, or invest in property,
> goods, or services, during or after the call.

Report and Order, *Rules and Regulations Implementing the Tel. Consumer Prot.*

*Act of 1991*, 18 FCC Rcd. 14,014, ¶ 142 (2003) ("2003 Order") (emphasis added).[2]

In other words, the FCC made clear that the "commercial" component the statute

requires for an "advertisement" is met only if the call is intended to *sell something*

*to the recipient*.  *See id.* ¶ 145 (concluding that a for-profit broadcaster's

advertisement of *free* over-the-air programming is not an "advertisement," but

when the same for-profit broadcaster advertises programming that can be obtained

only for a cost, that is an "advertisement.").  The FCC maintained that

---

[2] The 2003 Order was preceded by a 2002 notice of proposed rulemaking, in which
the FCC proposed that "free" offers should be treated as "advertisements" when
they are demonstrably "motivated in part by the desire *to ultimately sell additional*
*goods or services*."  Notice of Proposed Rulemaking and Memorandum Opinion
and Order, *Rules and Regulations Implementing the Tel. Consumer Prot. Act of*
*1991*, 17 FCC Rcd. 17,459, ¶ 31 (2002) (emphasis added).

interpretation in 2005.  *See* Second Order on Reconsideration, *Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 20 FCC Rcd. 3788, ¶¶ 42-44 (2005).  In 2007, the FCC further reaffirmed its view in a detailed letter to the Second Circuit, explaining that "a telemarketing message that promotes a *free* broadcast show *is deemed not to address the commercial availability or quality of the programming* … but a promotion for programming— even the very same programming—provided by a paid-for service is deemed a commercial advertisement that is barred under the statute."  FCC Letter Brief at 8, *Leyse v. Clear Channel Broad., Inc.*, No. 06-0152-cv (2d Cir. Apr. 11, 2007).

Shortly before oral argument in the *PDR IV* proceeding, PDR filed a supplemental authority letter attaching FCC enforcement materials showing how the FCC had interpreted its 2006 Order.  *See* No. 16-2185, Doc. 96 (4th Cir. Sept. 4, 2020).  These enforcement materials showed that the FCC did *not* describe its 2006 Interpretive Statement as reflecting a *per se* interpretation.

The enforcement materials, dating to 2010 and 2011, arise from a proceeding against the publisher of *Who's Who*.  *Who's Who* had sent faxes that offered nominally free listings in publications but were accompanied or followed up by additional communications that explicitly sought to sell the publications to those who had opted to be included.  Notice of Apparent Liability for Forfeiture, *Presidential Who's Who dba Presidential Who's Who, Inc.*, 25 FCC Rcd. 13759

(2010) ("2010 Notice"); Notice of Apparent Liability for Forfeiture, *Presidential Who's Who dba Presidential Who's Who, Inc.*, 26 FCC Rcd. 8989 (2011) ("2011 Notice"). Notably, the FCC did not conclude that the mere sending of a free listing offer gave rise to an "unsolicited advertisement." Rather, relying on the 2006 Interpretive Statement, the FCC's 2010 Notice concluded "that *when* promotions for 'free' services serve as *pretext for later solicitations*, the original promotional fax constitutes an advertisement." 2010 Notice ¶ 7 (emphases added) (citing 2006 Order ¶ 52). The 2011 Notice also relied on the fact that there were "attempts to sell the publication in follow-up calls between the complainant and the company" to conclude that because the faxes "appear to be part of an 'overall marketing campaign' to sell the publication" as contemplated in the 2006 Order, "*[u]nder these circumstances*," the faxes "qualify as unsolicited advertisements." 2011 Notice ¶ 8 (emphasis added).

After confirming that the district court was not bound to follow the 2006 Interpretive Statement, this Court opted not to resolve further questions going to the merits in the *PDR IV* proceeding. Because "the principal legal issues have changed, expanded, and become more complex," "rather than resolve new issues in the case for the first time," the panel decided to "narrow the inquiry and remand what remains to the district court for its consideration." *PDR IV*, 982 F.3d at 260. The Court remanded for the district court to determine whether the 2006

12

Interpretive Statement is entitled to deference under *Skidmore*, 323 U.S. 134. 982 F.3d at 265.[3]

On remand, Carlton sought leave to amend its complaint, and the district court granted the motion. As relevant here, Carlton newly alleges:

- That "Defendants are for-profit entities, not non-profit entities," A017 (Am. Compl. ¶ 16);

- That the fax in Exhibit A is a "pretext for further advertising" or "part of an 'overall marketing campaign,'" A015, A017 (Am. Compl. ¶¶ 2, 19);

- That "Defendants receive money from the pharmaceutical companies whose drugs are listed in the *Physicians' Desk Reference*, and, on information and belief, the amount of money that Defendants receive from the drug companies whose products are featured in the 2014 PDR e-Book turns on how many copies of the 2014 PDR e-Book Defendants distribute," so that "Defendants stand to profit when a provider accepts a free copy," A018 (Am. Compl. ¶ 20); and

---

[3] The Court's opinion also stated that PDR "did not … dispute that it sent the fax unsolicited" in its motion to dismiss or in defending the district court's initial dismissal order on appeal. *PDR IV*, 982 F.3d at 261 n.1. To be clear, PDR has accepted the truth of Carlton's allegations solely for the limited purpose of its Rule 12 motions.

- That "Defendants distribute the 2014 e-Book for free in the hope of future financial gain, which is a commonplace marketing tactic," and "Defendants offer other services to healthcare providers, and, on information and belief, they offer the e-Book for free in the hopes of establishing relationships with healthcare providers that will lead to future sales of other goods or services. Defendants distribute the free e-books to further their own economic interests," A018 (Am. Compl. ¶ 21).[4]

PDR moved to dismiss the Amended Complaint.

In the decision on appeal, the district court granted PDR's motion to dismiss the Amended Complaint. *See* A032-046. The district court first considered, as instructed by this Court, whether *Skidmore* deference to the 2006 Interpretive Statement was merited. *See* A037-043. As part of the initial inquiry for *Skidmore* deference, the district court determined that the statute is not ambiguous with respect to the definition of "unsolicited advertisement" and the requisite commercial component. A037-038. The district court reasoned that, based on ordinary statutory interpretation principles, the adjective "commercial" in the definition of "unsolicited advertisement" must modify both the "availability" and

---

[4] Carlton also modified certain allegations related to the proposed class, *see* A019-020, A022-023 (Am. Compl. ¶¶ 27, 32), and added allegations that Carlton received the fax in Exhibit on a "stand-alone fax machine," A016, A018-019 (Am. Compl. ¶¶ 11, 24)—neither of which bear on the motion to dismiss or this appeal.

14

the "quality" of goods or services.  A038-039.  Noting that many other courts that have reached the same result, the district court concluded that the TCPA is thus "unambiguous in requiring a commercial component to constitute an advertisement."  A039.

Even if the TCPA were ambiguous, the district court found in the alternative, *Skidmore* deference was not warranted.  A040.  The court explained that the 2006 Interpretive Statement was not persuasive because (i) "it is a 'rambling 22-page discussion' that is 'not written in the manner of a conventional regulation'"; (ii) "it has a striking absence of reasoning regarding its categorical conclusion," given that the FCC "did not explain its reasons for [creating a prophylactic presumption]," "nor did it cite any evidentiary support"; and (iii) it is "devoid of any statutory analysis."  A041 (citations omitted).  The district court also noted that the primary aim of the 2006 Order as a whole was to implement changes that had little to do with the term "unsolicited advertisement" (which remained largely unchanged save for the addition of the phase "in writing or otherwise"), and it "was not written to change or clarify the existing definition of unsolicited advertisement."  A041-042. The 2006 Interpretive Statement "reads as advice," providing "generalized

15

examples of behavior that is or is not covered," rather than "any specific rule." A042.[5]

Having determined that the 2006 Interpretive Statement was not entitled to deference under *Skidmore*, the district court turned to examine the sufficiency of the allegations. *See* A043-046. The court noted that "[t]he only reference to the products Defendant sell" comes from the reference to "'healthcare products and services,' … in the opt-out notice," and that "the vague allegation that Defendants 'stand to profit when a provider accepts a free copy [of the eBook]' is insufficient to survive dismissal" because the types of "ancillary benefit" alleged by Carlton are "too remote" to survive a motion to dismiss. A044-045. Despite Carlton's attempt to allege such an "underlying and distant commercial purpose," the district court found that these allegations do not change the fact that the fax—which "remains unchanged from the time of filing of the first Complaint"—"does not offer something for sale." A045. Accordingly, the district court concluded, "[n]one of these new allegations can create the required underlying commercial nexus where it does not exist within the fax at issue," A044, and the fax cannot constitute an "unsolicited advertisement" under the TCPA.

---

[5] The district court also noted that, "the PDR eBook at issue here is inapposite to the examples given by the guidance" in the 2006 Interpretive Statement because "the Order['s] discussion of faxes offering 'free magazine subscriptions, catalogs, or free consultation or seminars,' are all offers that promote items the sender actually sells." A042.

Carlton timely appealed.  *See* A048-049.

## SUMMARY OF ARGUMENT

**1**.     The district court correctly interpreted the statutory term "unsolicited advertisement," 47 U.S.C. § 227(a)(5), to encompass only communications that attempt to sell property, goods, or services.  Section 227(a)(5) defines an "unsolicited advertisement" as "any *material advertising* the *commercial availability or quality* of any property, goods, or services *which is transmitted* to any person without that person's prior express invitation or permission, in writing or otherwise."  *Id.* (emphases added).  The district court examined dictionary definitions of the words "advertising" and "commercial," and, applying established rules of grammar, found that the adjective "commercial" in the definition modifies both the "availability" and "quality" of any property, goods, or services.  A038.  In other words, to be an "unsolicited advertisement," a fax has to reflect either the commercial availability or the commercial quality of a property, good, or service. The district court thus correctly concluded that a fax can only be an "unsolicited advertisement" under the statutory definition if the fax aims to make a sale.  *See, e.g.*, *Optum Inc.*, 925 F.3d at 133 ("'[T]he fax must convey the impression … that a seller is trying to make a sale.'"); *Florence Endocrine Clinic, PLLC*, 858 F.3d at 1364 ("Because the faxes do not promote the sale of Arriva products, the faxes are not unsolicited advertisements."); 2010 Notice ¶ 7 ("[W]hen promotions for 'free'

services serve as pretext for later solicitations, the original promotional fax constitutes an advertisement.") (citing 2006 Order ¶ 52).

Carlton's contrary theory—that the word "commercial" modifies only "availability," and thus any fax that simply addresses the "quality" of a property, good, or service constitutes an advertisement, Br. 12—is one that no court has espoused. It is a reading that would expand the TCPA's reach beyond anything Congress could have envisioned. Constitutional avoidance principles counsel against a broader reading of the TCPA—on that reading, the statute would raise significant First Amendment concerns by restricting non-commercial as well as commercial speech—i.e., speech that promotes a commercial transaction.

**2.** The district court also correctly declined to extend *Skidmore* deference to the 2006 Interpretive Statement. Its conclusion that the term "unsolicited advertisement" is unambiguous provided independently sufficient grounds to decline deference. A037. But in line with this Court's instructions on remand, *PDR IV*, 982 F.3d at 264-65, the district court also considered whether the 2006 Interpretive Statement was entitled to deference based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Skidmore*, 323 U.S. at 140. Noting the 2006 Interpretive Statement's "striking absence of reasoning regarding its categorical conclusion that promoting

18

goods and services even at no cost are unsolicited advertisements under the TCPA," the court correctly concluded that the lack of any statutory analysis, as well as inconsistencies with the rest of the 2006 Order, precluded deference. A041.

Moreover, the 2006 Interpretive Statement—at least when interpreted as a *per se* rule that *all* offers of free goods and services are "unsolicited advertisements"—is inconsistent with the Commission's pronouncements before and after it issued the 2006 Order.  In 2003, addressing the same statutory definition in the robocall context, the Commission explained that a communication is an unsolicited advertisement if it "is intended to offer property, goods or services *for sale* either during the call, or in the future."  2003 Order ¶ 142 (emphasis added).  The Commission stuck to that position in a 2005 order and detailed it further in a 2007 letter to the Second Circuit.  And in 2010 and 2011, the Commission initiated an enforcement action against in which its liability determinations invoked the 2006 Interpretive Statement but made clear that, far from being a categorical rule, it understood it to mean only that "*when* promotions for 'free' services serve as *pretext for later solicitations*, the original promotional fax constitutes an advertisement."  2010 Notice ¶ 7 (emphases added) (citing 2006 Order ¶ 52); *see* 2011 Notice ¶ 7 (describing the 2006 Interpretive Statement as stating that "faxes promoting publications at no cost *can* qualify" as an unsolicited

advertisement). Thus, Carlton's proposed reading of the 2006 Interpretive

Statement as a categorical rule about *all* offers of free goods and services cannot

merit deference. Indeed, the Commission declined to defend or endorse such a

position in this Court.

**3.** The district court correctly determined that Carlton's amended

complaint failed to plausibly allege facts sufficient to establish that the fax in

question is an "unsolicited advertisement." None of Carlton's allegations alters the

fact that the fax "does not offer anything for sale." A045; *see* A044 ("[T]he fax

itself does not offer any products that Defendants directly sell, nor does it discuss

the quality or availability of those products to customers like health care

providers.").

Carlton raises only three underdeveloped arguments for why its allegations

supposedly should have been deemed sufficient. First, Carlton asserts that the fax

"relates to PDR's business" because it "asks recipients to contact

'customerservice@pdr.net' for additional information." Br. 20. Carlton waived

this argument by failing to explain the supposed relevance of this allegation to the

district court or this Court. In any event, the provision of customer support contact

information does not make a communication an "unsolicited advertisement."

Second, Carlton points to the opt-out language in fine print, which states:

"[T]o opt-out of delivery of clinically relevant information about healthcare

products and services from PDR via fax, call 866-469-8327." A031. Carlton has also waived this argument by failing to explain it to the district court or in its opening brief. And again, an opt-out clause that tells the recipient of the fax how to *avoid* receiving future communications about *other* products and services does not turn a fax into an "unsolicited advertisement."

Third, Carlton contends that because PDR is a "for-profit enterprise," it is reasonable to presume that there is a "business purpose" at play. Br. 20. But such an interpretation is untenable because the TCPA does not discriminate between for-profits and non-profits—if it did it would almost certainly be unconstitutional. Although Carlton leans heavily on the Second Circuit's decision in *Boehringer*, 847 F.3d 92, that decision is readily distinguishable. Here, it is undisputed that PDR does not manufacture or sell the products whose FDA-approved "full prescribing information" is republished in the Physician's Desk Reference, A043; *see also* A018 (Am. Compl. ¶ 20), whereas *Boehringer* turned on the allegation that the sender of the fax intended to market its own product at the free seminar. Accordingly, the district court was right to dismiss the complaint for failure to state a claim on which relief may be granted.

## STANDARD OF REVIEW

A dismissal for failure to state a claim is reviewed *de novo*. *Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141, 145 (4th Cir. 2018). A complaint must

contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## ARGUMENT

In line with the vast majority of judicial and Commission precedents interpreting 47 U.S.C. § 227(a)(5), and with the plain language of the text, the district court correctly interpreted that language to regulate and make punishable by statutory penalties only those unsolicited communications that attempt to sell property, goods, or services.

Turning then to the fax communication at issue in this case, the district court correctly concluded that the fax is not an "advertisement" because it did not reflect an attempt to sell anything—which Carlton's new allegations did not and cannot

22

change.  That straightforward decision was eminently correct, and it should be

affirmed.

**I.      The District Court Correctly Held That The TCPA's Definition Of The Term "Unsolicited Advertisement" Is Unambiguous And Satisfied Only By Communications Encompassing an Intent To Sell.**

In line with decisions of many other courts, the district court found that "[t]he

definition of unsolicited advertisement in the TCPA is, on its own, clear and easy

to apply."  A038; *see also* A039-040 (citing aligned court decisions).  That

conclusion was correct.

In interpreting a statute, a court must first apply all of the "traditional tools of

statutory construction," and only if the court is still "unable to discern Congress's

meaning" after that exercise, should the statute be identified as ambiguous.  *SAS

Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018); *see also Kisor v. Wilkie*, 139 S.

Ct. 2400, 2414 (2019) ("[T]he possibility of deference can arise only if a regulation

is genuinely ambiguous.  And when we use that term, we mean it—genuinely

ambiguous, even after a court has resorted to all the standard tools of

interpretation.").

The district court properly began with the statute's text, and specifically the

TCPA's definition of "unsolicited advertisement": "any *material advertising* the

*commercial availability or quality* of any property, goods, or services *which is

transmitted* to any person without that person's prior express invitation or

permission, in writing or otherwise." 47 U.S.C. § 227(a)(5) (emphases added); *see also Bruce Katz, M.D., P.C. v. Focus Forward, LLC*, 22 F.4th 368, 372 (2d Cir. 2022) (per curiam) ("In interpreting the TCPA, '[w]e begin with the language of the statute. If the statutory language is unambiguous, we construe the statute according to the plain meaning of its words.'").

Focusing on the words "advertising" and "commercial," the district court observed that the ordinary meaning of those terms, as made concrete by Black's Law Dictionary definitions, points to "published or transmitted matter made with the intention of attracting clients or customers" (*advertising*), and to matters "relating to, or involving the buying and selling of goods; mercantile" (*commercial*). A038. The district court also responded to Carlton's argument that the word "commercial" modifies "availability" but not "quality," which would treat the statute as saying that "any [transmitted] material advertising the … quality of any property, goods, or services" could qualify as an "unsolicited advertisement." A038. The district court explained, citing case law from the Supreme Court and this Court, that Carlton's argument was contrary to "[p]rinciples of ordinary English grammar," which "dictate that this Court read the adjective 'commercial' to modify both 'availability' and 'quality' of any property,

24

goods, or services." A038. And, as noted, the district court identified a host of cases that have adopted the same construction of the statutory phrase. A039-040.[6]

The district court's analysis and conclusions are fully aligned with the statutory text. The definition of "unsolicited advertisement" in 47 U.S.C. § 227(a)(5) unambiguously indicates that a fax (or other regulated communication) is the kind of transmission that the TCPA prohibits and makes punishable through the imposition of steep statutory damages only if it is intended to sell something.

First, the definition focuses on "material" that "advertis[es]." As Judge Chambers noted, Black's Law Dictionary defines "advertisement" as "[a] commercial solicitation; an item of published or transmitted matter made with the intention of attracting clients or customers." A038.

Second, the definition is limited to a subset of such materials—those "advertising the *commercial availability or quality* of any property, goods, or services." Thus, while the term "advertising" would on its own point to sales activity, the further restriction to materials that concern "the commercial availability or quality" of "property, goods, and services" confirms Congress's

---

[6] Subsequently, another district judge in this Circuit considered and followed Judge Chambers' analysis, likewise concluding that "to constitute an unsolicited advertisement under the TCPA, the Fax itself must relate to or involve the buying and selling of property, goods, or services." *Fam. Health Physical Med., LLC v. Pulse8, LLC*, No. CV SAG-21-2095, 2022 WL 596475, at *4 (D. Md. Feb. 28, 2022), *appeal docketed*, No. 22-1393 (4th Cir. Apr. 12, 2022). Counsel to Carlton is also counsel to the plaintiff in *Family Health*.

exclusive focus on attempts to sell. *See* A039 (noting that the "primary" definition of "commercial" in Black's Law Dictionary reads: "[o]f, relating to, or involving the buying and selling of goods; mercantile").

Third, the definition focuses on "material" "which is transmitted." In other words, the textual focus of the definition is on those communications that are sent through the channels regulated by the TCPA. The "transmitted" language underscores that the TCPA does not regulate other communications or business activities unrelated to the fax itself. To be an "unsolicited advertisement," the fax itself must attempt to make a sale, or be so integrally part of an attempted sale as to render the fax effectively a "pretext" to a solicitation. *See, e.g.*, *Sandusky*, 788 F.3d at 225; *Drug Reform Coordination Network, Inc. v. Grey House Publ'g, Inc.*, 106 F. Supp. 3d 9, 15 (D.D.C. 2015) (concluding fax was an "advertisement" where it offered "a free listing" but the offer "[w]as a prelude to later solicitations to purchase the Directory" including the listing); 2010 Notice ¶ 7 ("[W]hen promotions for 'free' services serve as pretext for later solicitations, the original promotional fax constitutes an advertisement.") (citing 2006 Order ¶ 52).

Fourth, the statute draws no distinction between communications sent by a non-profit entity and communications sent by a for-profit entity. *See Destination Ventures, Ltd. v FCC*, 46 F.3d 54, 56 (9th Cir. 1995) (upholding TCPA against First Amendment challenge on the ground that it is "even-handed, in that it applies

to commercial solicitation by any organization, be it a multinational corporation or the Girl Scouts"); *see also* 2006 Order ¶ 43 ("[N]either the TCPA nor its amendments carve out an exemption for nonprofits from the facsimile advertising rules."). So the same interpretation of the "unsolicited advertising" definition that applies to for-profit business also applies to non-profits. *Clark v. Martinez*, 543 U.S. 371, 379 (2005) ("[B]ecause the statutory text provides for no distinction between admitted and nonadmitted aliens, we find that it results in the same answer."). That makes sense because non-profits must also raise revenues to carry out their missions and frequently engage in revenue-raising activities that mirror activities that for-profit organizations also pursue—for example, both the Girl Scouts and Nestlé sell cookies.

Drawing on these textual cues, as well as various dictionary definitions of the words "commercial" and "advertising," courts have broadly concluded that the "commercial" element necessary to an "unsolicited advertisement" is satisfied only if the fax is aimed at selling the good or service described. *See Optum Inc.*, 925 F.3d at 133 ("'[T]he fax must convey the impression … that a seller is trying to make a sale,' [i]t is not enough that the sender sent a fax with a profit motive—in order to show that the sender is trying to make a sale, there must be a nexus between the fax and the purchasing decisions of an ultimate purchaser whether the recipient of the fax or a third party.") (citation omitted); *Robert W. Mauthe, M.D.,*

*P.C., v. Nat'l Imaging Assocs., Inc.*, 767 F. App'x 246, 249 (3d Cir. 2019) ("[T]he fax must convey the impression to its recipient that a seller is trying to make a sale to him."); *Boehringer*, 847 F.3d at 95 (reading the FCC's 2006 Interpretive Statement to require "plaintiffs to show that the fax has a commercial pretext—i.e., 'that the defendant advertised, or planned to advertise, its products or services at the seminar'"); *Florence Endocrine Clinic*, 858 F.3d at 1364  ("Because the faxes do not promote the sale of Arriva products, the faxes are not unsolicited advertisements."); *Sandusky*, 788 F.3d at 222 ("So to be an ad, the fax must promote goods or services to be bought or sold . . . ."); *N.B. Indus., Inc.*, 465 F. App'x  at 642 ("To be commercially available within the meaning of JFPA, a good or service must be available to be bought or sold (or must be a pretext for advertising a product that is so available).").

In contrast, Carlton does not identify a single judicial decision that has adopted its theory and held that a fax satisfies the statutory definition of "advertisement" simply because it discusses the "quality" of a good.  There are at least two reasons why.  First, as the district court ably explained, A038-039, under textbook rules of statutory interpretation, the word "commercial" in the statutory definition must modify both "availability" and "quality."  *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012) ("When there is a straightforward, parallel construction that involves all nouns or verbs in a

series, a prepositive or postpositive modifier normally applies to the entire series."); *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169-70 (2021) (applying the series-qualifier canon to a postpositive modifier); *Long v. United States*, 199 F.2d 717, 719 (4th Cir. 1952) ("The use of the adverb 'forcibly' before the first of the string of verbs … shows quite plainly that the adverb is to be interpreted as modifying them all."). Thus, an "unsolicited advertisement" must be a transmission that advertises either (1) the "*commercial* availability" of property, goods, or services ("we have cars for sale") or (2) the "*commercial* quality" of property, goods, or services ("the cars we sell are well-priced and reliable"). As the Sixth Circuit explained in rejecting the same argument that Carlton now advances, the central textual problem with Carlton's argument is that it would improperly read the word "commercial" out of the statute. *Sandusky*, 788 F.3d at 224.

Stripped in this way of a required link to commerce, the statute would produce absurd—and almost certainly unconstitutional—results by classifying practically any communication that describes the "quality" of "property, goods, or services" as an "unsolicited advertisement." Consider these examples:

- A health care clinic "call[s] attention" to the benefits of vaccination and healthcare screenings.

- A *New Yorker* book review "emphasizes" the "desirable qualities" of a novel.

- An environmental non-profit urges readers to purchase electric rather than gasoline-powered vehicles.

Under Carlton's proposed definition, each of these communications, and countless others, could be denominated "unsolicited advertisements" if transmitted through the wires, subject to regulation by the FCC and punishable through statutory damages in private suits. Congress cannot possibly have intended that result.

One strong reason to conclude that Congress did not want TCPA liability to sweep so far is that the constitutional implications would be enormous. The Supreme Court's case law has allowed Congress and state legislatures relatively greater scope to regulate "commercial speech"—i.e., "speech that proposes a commercial transaction." *Bd. of Trs. of State Univ. v. Fox*, 492 U.S. 469, 482 (1989). If (as PDR contends and the district court held) the TCPA's "unsolicited advertisement" prohibition reaches only communications that are attempting to sell something, then the TCPA lies well within that "commercial speech" zone. If, on the other hand, the TCPA attaches liability simply to communications that "describe" the "qualities" of goods or services, then Congress drove straight into the teeth of the First Amendment and subjected reams of speech that do not

propose a transaction to government regulation and censorship. On that construction, the TCPA is, at best, on thin constitutional ice.

The ordinary presumption is that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U. S. 568, 574-75 (1988). Here, that principle powerfully supports the interpretation of the TCPA adopted by the district court. In light of the many judicial decisions so holding, it is clearly possible and preferable to adopt a construction of the "unsolicited advertisement" definition that limits its sweep to communications promoting a sale, thereby avoiding the serious constitutional problems raised by Carlton's proposed interpretation. To the extent the Court has any lingering doubts about whether the district court and many other courts have correctly construed the TCPA's "unsolicited advertisement" definition as limited to communications that attempt a sale, constitutional avoidance principles should lay those doubts to rest.

A similar analysis applies to Judge Leval's suggestion that courts could avoid some of the pernicious policy effects of the *per se* rule by treating it as applicable to for-profit businesses but not non-profit organizations. *See Boehringer*, 847 F.3d at 103 (Leval, J., concurring). This Court's *PDR II* decision suggested a similar

31

possible dichotomy.  883 F.3d at 468 n.4.  But that two-prong approach is unavailable for two reasons.  First, as noted *supra* pp. 24-28, nothing in the statute's text permits an interpretation under which one liability standard applies to some entities and another applies to others.  There is just one unitary definition of "unsolicited advertisement," so one interpretation of the term must apply across all applications of the statute.  *See Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019) ("In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning.").  Second, a two-prong construction would raise serious First Amendment concerns by treating the TCPA as a statute that applies different speech constraints to different categories of speakers.  *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563-64 (2011); *Reed v. Town of Gilbert*, 576 U.S. 155, 159 (2015); *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (plurality).  Constitutional avoidance principles strongly counsel against adopting such a construction, especially where, as here, it cannot be said that Congress plainly intended to enact speaker-based discrimination.  *See Edward J. DeBartolo Corp.*, 485 U. S. at 574-75.  To the contrary, the TCPA has always been understood to be "even-handed" in its application.  *Destination Ventures*, 46 F.3d at 56.  This Court should not unsettle that understanding.

## II.     The FCC's 2006 "Free Goods and Services" Interpretation Is Not Entitled to *Skidmore* Deference Even If the Statute Is Deemed Ambiguous.

The district court correctly observed that once a court concludes that a statute

is unambiguous, it is unnecessary to consider any question of agency deference.

*See* A037 (quoting, *inter alia*, *Nahigian v. Juno-Loudon, LLC*, 677 F.3d 579, 587

n.6 (4th Cir. 2012) ("We hold that the plain language is unambiguous, thereby

foreclosing the use of the guidelines as an interpretive aid.")); *see SAS Inst., Inc.*,

138 S. Ct. at 1358.  If the Court agrees that the statute's text is unambiguous, it

need not consider *Skidmore* and may proceed directly to review the district court's

conclusion that Carlton's amended complaint failed to state a claim on which relief

may be granted.  *See* Section III *infra*.

Although Judge Chambers viewed the TCPA's relevant language as

unambiguous, he went on to examine the *Skidmore* question in the alternative,

consistent with this Court's mandate that the district court "analyze that issue in the

first instance," with "some basic guideposts" in mind.  *PDR IV*, 982 F.3d at 264-

65.  Those guideposts include that "the amount of Skidmore respect owed to an

agency interpretation will vary depending on that interpretation's particular

persuasive qualities." *Id.* at 265 (cleaned up).  *Skidmore* deference is not due to an

agency interpretation that is "completely devoid of any statutory analysis" and that

makes "no effort to explain or justify" the agency's conclusion.  *Id.*  At the other

33

end of the spectrum, *Skidmore* deference may be due to an agency interpretation that is both "thorough" and "consistent with earlier pronouncements." *Id.*

The district court faithfully applied these guideposts and concluded—consistent with the conclusions of other courts that have applied *Skidmore* analysis to the 2006 Interpretive Statement—that the Commission's "free goods and services" interpretation is not entitled to deference insofar as it proposes a "categorical" rule. That conclusion is correct for at least three reasons.

## A. The Commission Failed To Explain How A *Per Se* Rule Follows From the Text of the Statute Or Is Consistent With Other Statements Within The Same 2006 Publication.

As the district court observed, the 2006 Interpretive Statement "has a striking absence of reasoning regarding its categorical conclusion that faxes promoting goods and services even at no cost are unsolicited advertisements under the TCPA." A041. That is surely correct—in fact, it is a point of consensus between Judge Leval and Judge Chambers. Judge Leval observed in his *Boehringer* concurrence that the FCC "did not explain its reasons" for adopting what he understood to be a *per se* rule "rather than letting it be determined in litigation whether one who accepted the offer of free goods or services would ultimately confront an attempt to sell something." 847 F.3d at 101 (Leval, J., concurring). He also noted that the FCC had not discussed potential inconsistencies between its discussion of "offers of free goods and services" and other aspects of the same

34

order—in particular, the paragraphs addressed to non-profit activities. *Id.* at 102-03. Under *Skidmore*, the Commission's failures to explain its statutory analysis and the relationship of a "*per se*" interpretation to other statements in the same document are fatal to any claim for deference. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 645 (4th Cir. 2018).

Carlton briefly protests that the Commission's discussion was not "devoid of any statutory analysis" (Br. 16), but the argument peters out in a few sentences, and those sentences rest on an inaccuracy. Carlton's one effort to identify a link between the Commission's discussion and the statute's relevant text is to claim (Br. 16) that the Commission cited 47 U.S.C. § 227(a)(*5*) (the "unsolicited advertisement" definition) in the key paragraph of its discussion. Not so. The Commission actually cited § 227(a)(*4*) (defining "telephone solicitation"). 2006 Order ¶ 52 n.186. That hardly counts as a "thorough" statutory analysis of § 227(a)(5). In fact, to the extent the Commission's citation to § 227(a)(4) counts for anything, it supports PDR's view that only attempts to sell goods or services qualify as "unsolicited advertisements." As defined in § 227(a)(4), "telephone solicitation" means "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, good, or services." Those are sales calls.

**B.    The "*Per Se*" Construction of the 2006 Interpretive Statement Is Not Entitled To *Skidmore* Deference Because It Is Inconsistent With Other Commission Statements.**

Although the district court did not reach this issue, another reason that the Commission's 2006 Interpretive Statement cannot command *Skidmore* deference is that, to the extent it sets out a *per se* interpretation that all offers of free goods and services are "unsolicited advertisements," it is inconsistent with a series of other Commission rulings and statements. Specifically, the Commission also interpreted the statutory term "unsolicited advertisement" in 2003, 2005, 2007, 2010, and 2011. Each of those statements expresses the Commission's view that while *some* "offers for free goods and services" may constitute an "advertisement" because in light of surrounding context they reflect an effort to sell property, goods, or services, others are not "advertisements" because they do not attempt a sale.

The first in this line of statements was a 2003 Order of the Commission, which (unlike the 2006 Interpretive Statement) was issued after notice-and-comment. *See* 2003 Order. The 2003 Order interprets and applies the Commission's authority under 47 U.S.C. § 227(b)(2), a TCPA provision that authorizes the FCC to exempt certain calls from the general prohibition against making calls "to any residential telephone line using an artificial or prerecorded voice." *See* 47 U.S.C. § 227(b)(1)(b). Specifically, the Commission may exempt such "robocalls" if they (1) "are not made for a commercial purpose," or (2) are

within "such classes or categories of calls made for commercial purposes as the Commission determines—(I) will not adversely affect the privacy rights that this section is intended to protect; and (II) do not include the transmission of any unsolicited advertisement." *Id.* § 227(b)(2)(B). However, if a call involves "the transmission of any unsolicited advertisement," the Commission cannot exempt it. The scope of the Commission's power to exempt such calls thus turns on the same statutory term "unsolicited advertisement," *id.* § 227(a)(5), that underlies the constraint on fax transmissions in § 227(b)(1)(C) ("It shall be unlawful for any person within the United States . . . to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement," subject to enumerated exceptions).

The 2003 Order was preceded by a 2002 notice of proposed rulemaking, in which the Commission proposed that "free" offers should be treated as "advertisements" when they are demonstrably "motivated in part by the desire to ultimately *sell additional goods or services*." Notice of Proposed Rulemaking and Memorandum Opinion and Order, *Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 17 FCC Rcd. 17,459, ¶ 31 (2002) (emphasis added). The 2003 Order resolved that issue by stating:

> If the call is intended *to offer property, goods, or services for sale* either during the call, or in the future (such as in response to a message that provides a toll-free number), *that call is an advertisement*. Similarly, a message that

> seeks people to help sell or market a business' products, constitutes an advertisement if the individuals called are encouraged to purchase, rent, or invest in property, goods, or services, during or after the call.

2003 Order ¶ 142 (emphases added).

The Commission thus made clear that a transmission has the "commercial" purpose that the statute and the Commission's regulations make the hallmark of an "advertisement," only if the call is intended to *sell* something to the recipient.

In the same 2003 Order, the Commission applied its interpretation to robocalls made by radio and TV stations to promote free over-the-air broadcasts. It concluded that those calls are *not* "unsolicited advertisements" because the broadcasts they promote are free, and thus not commercially available to listeners. 2003 Order ¶ 145. But "messages that are part of an overall marketing campaign to encourage the purchase of goods or services, or that describe the commercial availability or quality of any goods or services are 'advertisements' as defined by the TCPA." *Id.* Therefore, "messages that encourage consumers to listen to or watch programming … for which the consumer must pay (*e.g.*, cable, digital satellite, *etc.*)," "would be considered advertisements for purposes of our rules." *Id.* ¶ 145 n.499.

The Commission adhered to that interpretation in 2005. *See* Second Order on Reconsideration, *Rules and Regulations Implementing the Tel. Consumer Prot. Act*

*of 1991*, 20 FCC Rcd. 3788, ¶ 44 (2005) ("We decline to reverse our conclusion regarding radio station and television broadcaster messages.").

The Commission reaffirmed its view once again in an April 11, 2007 letter addressed to the Second Circuit in response to that court's request for the FCC's views.  In that letter, submitted after the 2006 Order issued, the Commission explained that the distinction between free over-the-air and paid-for services turns on whether the consumer would ultimately have to pay to obtain the service described.  In the Commission's words:

> a telemarketing message that promotes a free broadcast show is deemed not to address the commercial availability or quality of the programming (and is within the Commission's statutory discretion to exempt it from TCPA restrictions), but a promotion for programming – even the very same programming – provided by a paid-for service is deemed a commercial advertisement that is barred under the statute.

FCC Letter Brief at 8, *Leyse v. Clear Channel Broad., Inc.*, No. 06-0152-cv (2d Cir. Apr. 11, 2007).

The Commission's most detailed explanations of the statutory term "advertisement" are thus squarely inconsistent with the 2006 Interpretive Statement, if that statement purports to announce a *per se* interpretation. Throughout these 2003, 2005, and 2007 statements, the Commission concluded that a transmission has the "commercial" element necessary to make it an "advertisement" only if it involves an attempt to make a sale of the good or service

39

described to the listener or recipient. That is precisely PDR's position, and the position of the courts on whose decisions PDR relies. *See, e.g.*, *Optum Inc.*, 925 F.3d at 133 ("'[T]he fax must convey the impression … that a seller is trying to make a sale,' [i]t is not enough that the sender sent a fax with a profit motive—in order to show that the sender is trying to make a sale, there must be a nexus between the fax and the purchasing decisions of an ultimate purchaser whether the recipient of the fax or a third party.") (citation omitted); *Boehringer*, 847 F.3d at 95 (reading FCC statement on free goods or services to require "plaintiffs to show that the fax has a commercial pretext—i.e., 'that the defendant advertised, or planned to advertise, its products or services at the seminar'"); *Florence Endocrine Clinic*, 858 F.3d at 1364 ("Because the faxes do not promote the sale of Arriva products, the faxes are not unsolicited advertisements."); *Sandusky*, 788 F.3d at 222 ("So to be an ad, the fax must promote goods or services to be bought or sold, and it should have profit as an aim."); *N.B. Indus., Inc.*, 465 F. App'x at 642 (because the item discussed in the fax was not "available to be bought or sold" or "for sale," it was not "commercially available" and thus not an "unsolicited advertisement").

Before the district court, Carlton argued that these FCC statements, which interpret "unsolicited advertisement" to exclude bona fide offers of services that consumers receive for free, were not evidence of agency inconsistency because

they concern the telephone provisions of the statute rather than the fax provisions of the statute. (Dkt. 86 at 12.) That argument is misplaced for two reasons.

First, while there certainly are other differences between the telephone and fax provisions of the statute, the exact same defined term, "unsolicited advertisement," applies to both. Both section 227(b)(2)(B) (regulating robocalls) and section 227(b)(1)(C) (regulating fax transmissions) turn on the same defined statutory term: "unsolicited advertisement." The agency cannot validly give a different interpretation to that term in different applications of it. "To give these same words a different meaning for each category would be to invent a statute rather than interpret one." *Clark*, 543 U.S. at 378; *See Cochise Consultancy*, 139 S. Ct. at 1512 ("[A] single use of a statutory phrase must have a fixed meaning.").

Second, in any event, the FCC also adopted the same *non-per se* interpretation of "unsolicited advertisement" in enforcing the fax provisions of the statute in 2010 and 2011. In those enforcement actions, the FCC interpreted the 2006 Interpretive Statement as providing that "*when* promotions for 'free' services serve as pretext for later solicitations, the original promotional fax constitutes an advertisement." 2010 Notice ¶ 7 (emphasis added) (citing 2006 Order ¶ 52). Perhaps more pointedly still, the Commission said—not that faxes promoting publications at no cost are always "unsolicited advertisements"—but that "faxes promoting publications at no cost *can* qualify." 2011 Notice ¶ 7 (emphasis added)

(describing and quoting 2006 Order ¶ 52). Homing in on the circumstances then before it, the FCC concluded that "[*i*]*n this instance*, we find that the faxes serve as part of an overall campaign to sell" a particular publication sold by the company that sent the fax. 2010 Notice ¶ 7 (emphasis added).

These enforcement statements plainly do not apply a *per se* rule that offers of free goods and services are always "unsolicited advertisements." In fact, although the 2010 and 2011 Notices both cite and rely on the 2006 Interpretative Statement—and the 2011 Notice even quotes from it—neither construes the 2006 Interpretive Statement as espousing a *per se* rule. The FCC instead construed the 2006 Interpretive Statement as calling for a case-specific inquiry that turns on whether the offers are an attempt to sell goods or services to the recipient. To the extent Carlton suggests that the 2006 Interpretive Statement purports to say something different, it cannot be afforded *Skidmore* deference. Indeed, the government declined to endorse or defend Carlton's *per se* interpretation when this case was last before this Court.

***

The parties have disputed the proper reading of the 2006 Interpretive Statement throughout this litigation. Carlton has contended that the 2006 Interpretive Statement is best read to say that *all* free offers of goods and services are "unsolicited advertisements." PDR, in contrast, has contended that the

42

Commission simply meant to say that *some* offers of free good and services can be "unsolicited advertisements," but each must be measured under the same statutory standard as other communications.

The same factors that deprive the *per se* interpretation of any claim to *Skidmore* deference also show that PDR has the better understanding of the FCC's 2006 Interpretive Statement.  Under PDR's approach, the 2006 Interpretive Statement is consistent with the statutory text and with the FCC's earlier and later statements regarding the interpretation of "unsolicited advertisement"—including the FCC's enforcement actions applying the 2006 Interpretive Statement.  PDR's approach explains why the FCC did not engage in a meaningful analysis of the text—it was, as Judge Chambers posited, providing "advice" in the form of "generalized examples of behavior that is or is not covered."  A042.

The Court need not revisit this dispute over how best to read the 2006 Interpretive Statement if it bases its analysis on the statute rather than an agency publication whose intent and meaning is disputed by the parties and was not meaningfully illuminated by the FCC's prior brief to this Court.  But if it does return to this issue, the Court should adopt PDR's construction of the 2006 Interpretive Statement.

**III.    The District Court Correctly Determined That Plaintiff's Amended Complaint Failed To Allege Facts Sufficient To Establish That PDR's Fax Is An "Unsolicited Advertisement."**

As the district court explained, and as the judicial and Commission precedents cited above make plain, the essential test of whether a communication is an "advertisement" under the TCPA is whether it attempts to make a sale.  A communication that "does not offer something for sale" "does not constitute an advertisement under the TCPA."  A045.

That test produces a straightforward answer when applied to the fax transmission in this case.  "[T]he fax itself does not offer any products that Defendants directly sell, nor does it discuss the quality or availability of those products to customers like health care providers."  A044.  And while plaintiff has strained to find a way to characterize the fax as a pretextual attempt to sell, that effort fails.  As the district court aptly put it:  "What the fax literally offers is a free and informational eBook. Alleging an underlying and distant commercial purpose does not change that."  A045.

Carlton contests that conclusion, asserting that its amended complaint "adequately alleges the Fax is a pretext to further advertising."  Br. 17.  But after asserting that conclusion, Carlton barely attempts to explain why the allegations of its amended complaint satisfy that standard.  Primarily, Carlton discusses other unrelated cases where courts have carefully reviewed the specific allegations

before them and have found that those particular allegations validly stated a claim

for which relief may be granted. To that extent, there is no disagreement between

the parties—PDR agrees with the black-letter proposition that on a motion to

dismiss, a court should conduct a case-specific review of the complaint's

allegations. And a fair review of the case law shows that many other TCPA fax

complaints have been dismissed at the pleading stage. *See, e.g.*, *Ambassador

Animal Hosp., Ltd. v. Elanco Animal Health, Inc.*, No. 20-CV-2886, 2021 WL

633358, at *4 (N.D. Ill. Feb. 18, 2021) (dismissing TCPA claim based on a fax

promoting a free seminar where plaintiff failed to "allege a commercial purpose for

the faxes with particularity," such as that the "registration for the seminars required

consent to receive future marketing"); *Physicians HealthSource, Inc. v. MultiPlan

Servs., Corp.*, No. CIV.A. 12-11693-GAO, 2013 WL 5299134, at *2 (D. Mass.

Sept. 18, 2013) (dismissing TCPA claim where "the text of the facsimile does not

support [plaintiff's] conclusory allegation" because the fax "provides information

concerning services already available" to the recipient); *ARcare v. IMS Health,

Inc.*, No. 2:16CV00080 JLH, 2016 WL 4967810, at *3 (E.D. Ark. Sept. 15, 2016)

(dismissing TCPA claim where there were no allegations that the fax "would be

followed by a commercial solicitation for the recipient to purchase services"); *but

see, e.g.*, *Drug Reform Coordination*, 106 F. Supp. 3d at 13 (denying motion to

dismiss where the fax offering a free listing in a directory was followed by "three direct solicitation emails" that solicited purchases of the directory).

Carlton seemingly attempts to cast the Second Circuit's *Boehringer* decision as establishing a "standard" for review of "motions to dismiss for failure to state a claim at the pleading stage on a fax offering free goods or services." Br. 19. But of course, Rules 8 and 12 and the cases construing those Rules establish the applicable standards. *Boehringer* merely applied those standards to the allegations before it. And as to that, *Boehringer* held that "at the pleading stage, where it is alleged that a firm sent an unsolicited fax promoting a free seminar discussing a subject that relates to the firm's products or services, there is a plausible conclusion that the fax had the commercial purpose of promoting those products or services." 847 F.3d at 95. Given those allegations, *Boehringer* held, it was not necessary for the complaint to plead *additional* facts to survive the motion to dismiss. *Id.* at 96-97.[7]

---

[7] The *Boehringer* court also suggested in passing that the TCPA is a "remedial" statute, 847 F.3d at 96, but that characterization does not appear to have been germane to its analysis. The civil procedure rules, not the "remedial" or "non-remedial" nature of a statute, determine whether a complaint's allegations are sufficient to survive a motion to dismiss.

*See Sandusky*, 788 F.3d at 224 ("And no, we won't 'broadly construe' the [TCPA] in Sandusky's favor because it is a so-called 'remedial statute.' … [S]ince all statutes remedy what's seen as a problem, which statutes do not deserve a broad construction? In any event, insofar as our case law requires the canon's application at all, it doesn't require it when the statute's language is plain, as it is here. 'The broad remedial goals of the [] Act' (assuming there are such goals) 'are

The other cases Carlton cites are similar—the decisions turn on the individual allegations of the complaint.  Take for example *Addison Automatics, Inc. v. RTC Group, Inc.*, No. 12 C 9869, 2013 WL 3771423, at *2 (N.D. Ill. July 16, 2013). Carlton describes that decision as having denied the motion to dismiss because "free seminars are often a pretext to market products or services."  Br. 19.  The *Addison* court's statement, however, was that "faxes promoting free seminars *may be* unsolicited advertisements because 'free seminars are often a pretext to market products or services.'"  *Addison Automatics, Inc.*, 2013 WL 3771423, at *2.  The court then reviewed the specific allegations before it to decide whether the claims before it would survive.  On that review, it concluded that "[t]he plain language of the fax makes it plausible that the seminar would be used to market the Defendants' products and services."  *Id.* at *3.  For example, statements within the fax fairly suggested that "Defendants intended to market their products and services at the seminar so that the attendees would purchase those products and services when they make their 'next design decision,'" and "the fact the fax specifically describes the [defendants'] products the attendees would receive information and training on." *Id.*

---

insufficient justification for interpreting a specific provision more broadly than its language and the statutory scheme reasonably permit.'") (citations omitted).

Carlton's reliance on *St. Louis Heart Center, Inc. v. Forest Pharmaceuticals, Inc.*, No. 4:12-CV-02224, 2013 WL 1076540 (E.D. Mo. Mar. 13, 2013) is similarly misplaced. *See* Br. 19. After noting the FCC's 2006 Interpretive Statement, that court turned to the specific allegations before it, concluding that "there is enough in the way of product-driven content in the fax messages here to raise an issue of fact whether a 'medical discussion regarding the treatment of hypertension' is tantamount to a free seminar serving as 'a pretext for advertising commercial products and services.'" 2013 WL 1076540 at *4.

When Carlton finally turns to what it has pleaded *in this case*, it offers up only a single paragraph about its specific allegations. Br. 20.[8] That paragraph references three points, briefly.

---

[8] Carlton does not rely in its opening brief on certain allegations in the amended complaint. For example, Carlton does not take issue with the district court's decision to reject as irrelevant Carlton's unanchored assertion that "Defendants receive money from the pharmaceutical companies whose drugs are listed in the Physicians' Desk Reference, and … the amount of money that Defendants receive from the drug companies whose products are featured in the 2014 PDR e-Book turns on how many copies of the 2014 PDR e-Book Defendants distribute, and so Defendants stand to profit when a provider accepts a free copy." A044 (quoting Am. Compl. ¶ 20). Carlton has thereby waived any argument based on that allegation. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (cleaned up) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue."). In any case, the allegation adds little to Carlton's case. As explained, the statutory test—and the test long applied by the FCC—is whether the fax transmission attempts to sell something to the recipient. *See* FCC Letter Brief at 8, *Leyse v. Clear Channel Broadcasting, Inc.*, No. 06-0152-cv (2d Cir. Apr. 11, 2007) (distinction between robocalls that are "unsolicited advertisements"

48

First, Carlton contends that the fax "relates to PDR's business" because it "asks recipients to contact 'customerservice@pdr.net' for additional information." Br. 20.  It is not clear what Carlton is saying about that statement or how PDR's identification of a customer service email address relates in any way to the statutory definition of "unsolicited advertisement."  Having failed to identify its argument to the district court (*see* Dkt. 86 at 16, where Carlton presented the same unexplained statement) or on appeal, Carlton has waived any reliance on it.  *See Grayson O Co.*, 856 F.3d at 316.

Second, Carlton points to the opt-out language in the fine print at the bottom of the fax, which reads: "[T]o opt-out of delivery of clinically relevant information about healthcare products and services from PDR via fax, call 866-469-8327.  You are receiving this fax because you are a member of the PDR Network."  A031. Again, Carlton waived its argument by failing to identify any *reason* why this statement should matter to the Court's statutory analysis, and by also failing to make any such argument to the district court.  (*See* Dkt. 86 at 16.)  At most, Carlton appears to contend that this language "refers to 'healthcare products and services from PDR.'"  Br. 20.  But the statutory standard does not classify faxes that merely "refer to products and services" as being "unsolicited advertisements,"

---

and those that are not turns on whether the promoted good is free, even if promoted by same for-profit radio or TV station).  The allegation that PDR has an underlying economic motive to distribute free eBooks has no bearing on that statutory test.

and neither does the FCC's guidance.  And Carlton does not identify any judicial decision that so much as hints that opt-out language that tells the reader how to *avoid* receiving information about *other* products and services in the future could possibly constitute an "unsolicited advertisement."  At most, case law suggests that where a fax sender *requires* a recipient of a free seminar invitation to *opt in* to future marketing faxes in order to accept free seminar invitation, the free seminar fax may be regarded as a "pretext."  *See Ambassador Animal Hosp.*, 2021 WL 633358, at *4 (noting the pretext theory may apply to a fax offering a free seminar where "the plaintiff was … required to *opt-in* to the defendant's future marketing to attend the seminar") (emphasis added).  But Carlton's pleading does not allege any similar opt-in approach, the fax itself does not contain any opt-in requirement, and Carlton has completely failed to offer any theory in its amended complaint or in its briefing for why an opt-*out* provision creates liability.

Carlton's third point appears to be its core argument: "PDR Network is a for-profit enterprise," and it is supposedly "reasonable at the pleading stage to presume, as the Second Circuit did, that for-profit businesses do not send offers of free goods and services 'for no business purpose.'"  Br. 20.  This of course, is a barely disguised way of arguing for a *per se* rule applicable to for-profit businesses—and as explained, the statute does not distinguish between for-profit and non-profit entities (nor could it do so without, at a minimum, casting serious

50

constitutional doubt on the TCPA's validity).  Here the *per se* argument is framed as a pleading presumption, designed to excuse Carlton from having to plead any facts other than that the fax somehow "relates to" PDR's business.  Carlton argues that the *Boehringer* court approached the claims in that case in the same way, but as previously explained, that is incorrect.  The *Boehringer* majority took a far narrower view, holding only that "where it is alleged that a firm sent an unsolicited fax promoting a free seminar discussing a subject that relates to the firm's products or services, there is a plausible conclusion that the fax had the commercial purpose of promoting those products or services.  *Businesses are always eager to promote their wares* and usually do not fund presentations for no business purpose." *Boehringer*, 847 F.3d at 95 (emphasis added); *see also Optum*, 925 F.3d at 133 ("It seems beyond doubt that a fax does not become an advertisement merely because the sender intended it to enhance the quality of its products or services and thus its profits. After all, a commercial entity takes almost all of its actions with a profit motivation.").[9]

---

[9] And courts have uniformly found that a distant or hypothetical hope for profit down the line is insufficient. *See* A018 (Am. Compl. ¶ 21) (alleging that Defendants offer the eBook "for free in the hopes of establishing relationships with healthcare providers that will lead to future sales of other goods or services"). "The fact that the sender might gain an ancillary, remote, and hypothetical economic benefit later on does not convert a noncommercial, informational communication into a commercial solicitation." *Sandusky*, 788 F.3d at 225 (rejecting the idea that an informational fax was an advertisement because "[n]o matter what the faxes look like on their face, a jury might conclude that, taken

Here, as the district court aptly observed, it is uncontested that PDR does not manufacture or sell the products described in the Physician's Desk Reference. A043; *see also* A018 (Am. Compl. ¶ 20) (it is "the pharmaceutical companies whose drugs are listed in the *Physicians' Desk Reference*"). That fact plainly distinguishes this case from *Boehringer*, where the allegation was precisely that the sender was planning to market its "wares" at the free seminar. And as the fax itself recites, the Physician's Desk Reference publishes "FDA-approved full prescribing information." A031.[10] The "full prescribing information" that FDA approves for pharmaceuticals is factual, scientific in nature, and clinically important to doctors' decisions about how to prescribe safe and effective medications to treat their

---

together, they have a positive effect on Medco's business—and thus must have been sent to promote its product or services, with profit in mind").

[10] This meets Carlton's objection that it would like discovery in order to understand the contents of the 2014 eBook. Br. 21. Carlton has already pleaded the contents by way of the fax attached to its complaint, which describes what the eBook contains: the "[s]ame trusted, FDA-approved full prescribing information" as the print publication, "[n]ow in a new, convenient digital format." A031 (Ex. A, Am. Compl.). Carlton notably has not pleaded that any statement in the fax is false, nor has it pleaded any reason to think PDR would have had a reason to mislead physicians about the contents of the Physician's Desk Reference, which Carlton's complaint concedes is "the most recognized drug information reference available in the U.S." A017 (Am. Compl. ¶ 17). And if Carlton's Illinois-based counsel truly wanted to know what that reference volume contains, a trip to the Chicago Public Library would have sufficed. *See Keyword Search: Physician's Desk Reference*, Chi. Pub. Libr. https://www.chipublib.org/ (last visited June 24, 2022) (search function lists Physician's Desk Reference editions available for many years dating back to the 1970s, including 2014).

patients' conditions.  Among other subjects, this "full prescribing information"

pertains to matters such as approved uses, dosing, potential side effects, and

interactions with other drugs that may, in some circumstances, be dangerous or

even fatal to patients.[11]  "Full prescribing information" is not advertising—not

even close.  As the district court observed, it is quintessentially informational.

A045.  For all of these reasons, Carlton has failed to identify any material flaw in

the district court's narrow and carefully reasoned decision that the particular

allegations in this case—as framed by an amended complaint filed more than *seven*

*years* after the fax at issue was sent and more than *five years* after the original

complaint was filed—do not state a claim on which relief may be granted.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

June 24, 2022                                 Respectfully submitted,

Jeffrey N. Rosenthal
BLANK ROME LLP                             /s/ Kwaku A. Akowuah
130 N. 18th Street                          Carter G. Phillips
                                           Kwaku A. Akowuah

---

[11] The Food and Drug Administration publishes many such examples of full
prescribing information on its website, which are available for public viewing.
Here, for example, is the full prescribing information for the anti-hyperactivity
drug Adderall.  *Label for Adderall® CII*, FDA,
https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/011522s043lbl.pdf
(last visited June 24, 2022). For another example, see the full prescribing labeling
for Keytruda, the anti-cancer therapy.  *Label for KEYTRUDA®*, FDA,
https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/125514s096lbl.pdf
(last visited June 24, 2022).

Philadelphia, PA 19103
(215) 569-5553

Ana Tagvoryan
BLANK ROME LLP
2029 Century Park East
6th Floor
Los Angeles, CA 90067
(424) 239-3400

Alice A. Wang
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
cphillips@sidley.com

*Counsel for PDR Network, LLC, et al.*

## CERTIFICATE OF COMPLIANCE

Under Federal Rule of Appellate Procedure 29(a)(4)(g), I certify that:

This brief complies with Rule 29(a)(5)'s type-volume limitation because it contains 12,882 words, as determined by the Microsoft Word 2016 word-processing system used to prepare the brief, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with Rule 32(a)(5)'s typeface requirements and Rule 32(a)(6)'s type-style requirements because it has been prepared in a proportionately spaced typeface using the 2016 version of Microsoft Word in 14-point Times New Roman font.

/s/ Kwaku A. Akowuah

KWAKU A. AKOWUAH

## CERTIFICATE OF SERVICE

I certify that I caused this document to be electronically filed with the Clerk of the Court using the appellate CM/ECF system on June 24, 2022. All participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Kwaku A. Akowuah
KWAKU A. AKOWUAH