No. 22-1279

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CARLTON & HARRIS CHIROPRACTIC, INC., *et al.*

*Appellant*

v.

PDR NETWORK, LLC, PDR DISTRIBUTION, LLC,
PDR EQUITY, LLC, *et al.*

*Appellees*

Appeal from the United States District Court
for the Southern District of West Virginia (at Huntington)
District Court No. 3:15-cv-14887
The Honorable Robert C. Chambers, Chief Judge Presiding

## REPLY BRIEF OF APPELLANT

Glenn L. Hara                          D. Christopher Hedges
ANDERSON + WANCA                       CALDWELL LUCE DITRAPANO
3701 Algonquin Rd., Suite 500          500 Randolph Street
Rolling Meadows, IL  60008             Charleston, WV  25302
Telephone:  (847) 368-1500             Telephone:  (304) 400-6558

*ORAL ARGUMENT REQUESTED*

## <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

TABLE OF CONTENTS.....................................................................i

TABLE OF AUTHORITIES ......................................................... ii

    I.      The Court should reverse based on the plain language of the statutory definition of "advertisement.".............................1

    II.     If the Court finds the statute ambiguous, then the district court should be reversed under the remedial-statute doctrine, which PDR Network does not meaningfully address .................8

    III.   If the Court finds the statute ambiguous, it should defer to the FCC's 2006 Order and reverse........................................12

CONCLUSION ...............................................................................16

# TABLE OF AUTHORITIES

**CASES**                                                                                  **Page**

*Advanced Dermatology v. Fieldwork, Inc.,*
    2021 WL 3077663 (N.D. Ill. July 21, 2021) ........................................... 15

*Am.'s Health & Res. Ctr., Ltd. v. Promologics, Inc.,*
    2017 WL 5001284 (N.D. Ill. Nov. 2, 2017) ............................................ 14

*Ambassador Animal Hosp., Ltd. v. Elanco Animal Health, Inc.,*
    2021 WL 633358 (N.D. Ill. Feb. 18, 2021) ....................................... 14, 15

*Barr v. Am. Ass'n of Political Consultants, Inc.,*
    140 S. Ct. 2335 (2020) ............................................................................ 11

*Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC,*
    883 F.3d 459 (4th Cir. 2018) ........................................................ 8, 11, 13

*Chapman v. First Index, Inc.,*
    796 F.3d 783 (7th Cir. 2015) .................................................................... 6

*Comprehensive Health Care Sys. of the Palm Beaches, Inc. v. M3 USA Corp.,*
    232 F. Supp. 3d 1239 (S.D. Fla. 2017) .................................................. 14

*Florence Endocrine Clinic, PLLC v. Arriva Med., LLC,*
    858 F.3d 1362 (11th Cir. 2017) ............................................................... 3

*Foster v. Univ. of Md.-E. Shore,*
    787 F.3d 243 (4th Cir. 2015) ............................................................. 9–10

*Gager v. Dell Fin. Servs., LLC,*
    727 F.3d 265 (3d Cir. 2013) .................................................................... 9

*Gilbert v. Residential Funding LLC,*
    678 F.3d 271 (4th Cir. 2012) ................................................................... 2

*Holtzman v. Turza,*
    728 F.3d 682 (7th Cir. 2013) ................................................................... 8

# TABLE OF AUTHORITIES

**CASES**                                                                                    **Page**

*In re Total Realty Mgmt., LLC*,
        706 F.3d 245 (4th Cir. 2013) ...................................................................... 4

*N. Suburban Chiropractic Clinic, Ltd. V. Merck & Co.*,
        2013 WL 5170754 (N.D. Ill. Sept. 13, 2013)........................................ 14

*Palm Beach Golf Center-Boca, Inc. v. Sarris*,
        781 F.3d 1245 (11th Cir. 2015) ............................................................... 12

*Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*,
        950 F.3d 959 (7th Cir. 2020) ............................................................... 9, 15

*Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharma., Inc.*,
        847 F.3d 3d at 92 (2d Cir. 2017) ......................................................... 1, 9

*PSINet, Inc. v. Chapman*,
        362 F.3d 227 (4th Cir. 2004) .................................................................... 4

*Reed v. Town of Gilbert*,
        576 U.S. 155 (2015)................................................................................. 11

*Russell v. Absolute Collection Servs., Inc.*,
        763 F.3d 385 (4th Cir. 2014) .................................................................... 9

*Sandusky Wellness Ctr. LLC v. Medco Health Sols., Inc.*,
        788 F.3d 218 (6th Cir. 2015) .................................................................. 10

*Skidmore v. Swift & Co.*,
        323 U.S. 134 (1944)................................................................................. 12

*Sorrell v. IMS Health Inc.*,
        564 U.S. 552 (2011)................................................................................. 11

*Textron, Inc. v. Comm'r*,
        336 F.3d 26 (1st Cir. 2003)....................................................................... 2

# TABLE OF AUTHORITIES

**CASES**                                                            **Page**

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)................................................................. 12

**STATUTES**

47 U.S.C. § 227(a)(5)................................................................*passim*
47 U.S.C. § 227(b)(1)(C) ............................................... 6, 9, 11, 12
47 U.S.C. § 227(b)(1)(C)(i)–(iii) ........................................... 6

**RULES & REGULATIONS**

*In re Rules & Regulations Implementing the Telephone*
*Consumer Protection Act; Junk Fax Prevention Act of 2005*,
21 FCC Rcd. 3787 (Apr. 6, 2006)..................................... 12, 13, 15, 16

*In re Presidential Who's Who DBA Presidential Who's Who, Inc.*,
25 FCC Rcd. 13759 (FCC Sept. 13, 2010) ................................ 13–14

**OTHER AUTHORITIES**

Antonin Scalia & Bryan Garner, Reading Law (2012) ........................................ 4

Plaintiff, Carlton & Harris Chiropractic, Inc. ("Carlton & Harris"), states as follows for its Reply Brief. As argued below, the Response Brief filed by Defendants, PDR Network, LLC, PDR Distribution, LLC, and PDR Equity, LLC ("PDR Network"), fails to rebut Carlton & Harris's showing that the Fax PDR Network sent to Carlton & Harris and a putative class of others is either (1) an "advertisement" as a matter of law under the plain language of the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227(a)(5); or (2) at least "plausibly" an advertisement for purposes of defeating PDR Network's motion to dismiss for failure to state a claim in light of the "remedial" nature of the statute and the FCC's interpretation that a fax offering free goods or services that relates to the fax sender's business is "presumed" to be an advertisement. *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847 F.3d 92, 96 (2d Cir. 2017) ("*Boehringer*").

## I.    The Court should reverse based on the plain language of the statutory definition of "advertisement."

Carlton & Harris's Opening Brief demonstrated that the plain language of 47 U.S.C. § 227(a)(5) states that the word "advertisement" encompasses any material advertising the "quality of any . . . goods . . . ." (Carlton & Harris Br. at 10). PDR Network's Response Brief does not dispute that the 2014 eBook is a "good." (Resp. Br. at 28; *see also* A034 (district court agreeing the 2014 eBook is a

"good")). PDR Network also does dispute that the Fax describes the "quality" of the 2014 eBook by stating it is "trusted," "new," and "convenient." (A031).

PDR Network resists the plain-language conclusion that the Fax meets the statutory definition, however, arguing that (1) the word "advertise" in the statute is implicitly limited to attempts to sell something; and (2) the word "quality" in the statute really means "commercial quality." (Resp. Br. at 25–29). Neither argument holds up under scrutiny.

PDR Network's artificial constraint on the word "advertise" as being limited to offers to sell something fails because the plain and ordinary meaning of that word is not so limited. *Gilbert v. Residential Funding LLC*, 678 F.3d 271, 276 (4th Cir. 2012) (holding "if the language of a statute or regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written") (quoting *Textron, Inc. v. Comm'r*, 336 F.3d 26, 31 (1st Cir. 2003)). Surely, *one* meaning of "advertise" is to attempt to sell something, but that is not the *only* meaning of the word. Carlton & Harris relied on Webster's Dictionary, which lists three main meanings for the word "advertise," only the third of which includes an attempt "to arouse a desire to purchase." (Carlton & Harris Br. at 10). The first two definitions of "advertise" in Webster's are much broader, meaning "to make something known" or "to make publicly and generally known," such as "a poster *advertising* forthcoming events." (*Id.*)

2

Under PDR Network's cramped reading of the word, one could not "advertise" an upcoming event, such as a free music concert. Yet surely this usage falls within the common meaning of the word "advertise," and the restrictive reading PDR Network argues for is far too narrow. PDR Network is myopically focusing on one aspect of the multiple meanings of the word "advertise" to reach its desired result.

The authorities upon which PDR Network relies similarly cherry-pick dictionary definitions to arrive at their result. For example, the Eleventh Circuit in *Florence Endocrine Clinic, PLLC v. Arriva Med., LLC*, 858 F.3d 1362, 1366 (11th Cir. 2017) (cited in Resp. Br. at 2, 17, 28, 40), relied on the definition of *advertisement* in the Oxford English Dictionary, which is generally regarded as the most authoritative English dictionary, for its conclusion that an "advertisement" must "promote sales." But the court cited only one half of the fourth entry for that word in the OED, the complete version of which reads as follows:

> 4.a transitive. To make generally known by means of an announcement in a public medium; spec. *(a)* to publish information about (a person (now *rare*), thing, circumstance, or event) so as to attract public attention; *(b)* to describe or present (a product, service, or the like) in order to promote sales. Frequently with *by*, *in*, *on* the medium specified (as a journal, radio, television, etc.). (Now the most common sense.)

(*Advertise*, Oxford English Dictionary (online ed. 2022); *see also id.*, Entry 3 ("To give notice of (something); to make generally known")). Although the common,

3

ordinary meaning of "advertise" covers attempts to sell something, it is plainly not limited to such communications.

With respect to PDR Network's argument that the word "quality" must be modified by the word "commercial," Carlton & Harris's Opening Brief argued that this reading is not an example of the type of "straightforward, parallel construction" referred to in Antonin Scalia & Bryan Garner, *Reading Law* 149 (2012)), because it leads to a redundancy in the statute. (Carlton & Harris Br. at 12 (citing *In re Total Realty Mgmt., LLC*, 706 F.3d 245, 254 (4th Cir. 2013) (holding the Court "seek[s] to give meaning to every word and 'reject constructions that render a term redundant'") (quoting *PSINet, Inc. v. Chapman*, 362 F.3d 227, 232 (4th Cir. 2004)). Carlton & Harris argued that "*commercial* availability" and "*commercial* quality" are redundant because "commercial quality" can only mean the "quality of being commercially available," which means the same thing as "commercial availability." (*Id.*)

PDR Network completely ignores Carlton & Harris's argument that its reading of the statute creates a redundancy, neither mentioning the word "redundant" or citing *In re Total Realty Mgmt*. (Resp. Br. at 28–29). Nor does PDR Network attempt to meaningfully distinguish between "commercial availability" and "commercial quality." (*Id.*) The closest PDR Network comes to explaining what "commercial quality" means in its construction of the statute is to suggest in a

parenthetical that "the cars we sell are well-priced and reliable" is an example of a statement regarding "commercial quality," while "we have cars for sale" is an example of a statement regarding "commercial availability." (*Id.* at 29). But "well-priced and reliable" are merely statements of "quality," already covered by the plain language of the statute; there is no need to read the additional word "commercial" into the statute where it does not exist.

Faced with the broad language of the statutory definition, PDR Network offers a *reductio ad absurdum*, arguing that Carlton & Harris's reading of the statute cannot be correct because it would cover (1) a fax sent by a health care clinic that "call[s] attention" to the benefits of vaccination and healthcare screenings; (2) a fax sent by an unidentified person containing a *New Yorker* book review "emphasizing" the "desirable qualities" of a novel; or (3) a fax sent by an environmental non-profit urging readers to purchase electric rather than gasoline-powered vehicles. (Resp. Br. at 29–30). But these outcomes are not absurd at all.

The "property, goods, or services" advertised in PDR Network's hypotheticals (vaccinations/healthcare screenings, novels, and electric vehicles) are all commercially available goods or services. There is no reason why the hypothetical fax sender in each of PDR Network's scenarios should not be required to comply with the rules Congress has laid out governing the sending of unsolicited advertisements by fax, which require (1) an "established business relationship"

5

between the sender and recipient; (2) that the sender obtained the fax number in a permissible way; and (3) that the fax include a compliant "opt-out notice" telling the recipient how to stop receiving such faxes in the future. 47 U.S.C. § 227(b)(1)(C)(i)–(iii). These are "simple rules" that an entity like PDR Network (or PDR Network's hypothetical senders) should easily be able to abide by. *Chapman v. First Index, Inc.*, 796 F.3d 783, 784 (7th Cir. 2015).

This aspect of the statute highlights a misconception underlying both the district court's decision and PDR Network's Response Brief: the notion that the TCPA "prohibits and makes punishable" the sending of any "unsolicited advertisement." (Resp. Br. at 25; *see also* A043 (district court refusing to impose "blanket ban on any fax that offers a free good or service")). Contrary to this misconception, the statute does not "ban" unsolicited fax advertisements; it *regulates* them. Fax senders are free to send unsolicited fax advertisements as long as they comply with the rules. *See* 47 U.S.C. § 227(b)(1)(C).

Finally, even the Court agrees with PDR Network that a "commercial nexus" with the fax sender's business is required, there is such a nexus here because the Fax PDR Network sent Carlton & Harris advertises the "commercial availability" of PDR Network's products and services. The Fax states: "To opt-out of delivery of clinically relevant information *about healthcare products and services from PDR* via fax, call 866-469-8327. You are receiving this fax because

you are a member of the PDR Network." (A031 (emphasis added)). In other words, PDR Network has admitted on the face of the Fax that it is advertising the availability of its healthcare products and services, which are clearly commercially available. At the very least, the reasonable inference, to which Carlton & Harris is entitled at the pleading stage, is that the Fax advertises "healthcare products and services from" PDR Network. The Fax may not identify specific products or services, but it announces that PDR Network has commercially available "healthcare products and services" to offer "member[s] of the PDR Network," and it touts the "quality" of those unspecified products and services as "clinically relevant" to healthcare practitioners. (A031).

PDR Network brushes off the reference to PDR Network's "healthcare products and services" on the Fax on the basis that it is contained in the opt-out notice at the bottom of the page and suggests that "an opt-out clause that tells the recipient of the fax how to *avoid* receiving future communications about *other* products and services does not turn a fax into an 'unsolicited advertisement.'" (PDR Br. at 21). The district court similarly dismissed the reference to PDR Network's "healthcare products and services" on the basis that it is "in tiny print at the bottom of the page." (A044). That PDR Network failed to make its opt-out notice "clear and conspicuous" as required by the statute does not somehow erase the fact that the Fax indeed advertises the availability of PDR Network's

healthcare products and services. By that rationale, even if the Fax had in tiny print
"this is an advertisement," such text could not be used to show at the pleading
stage that it is plausible the Fax is an advertisement.

Moreover, the statute says that an advertisement is "any" material
advertising the commercial availability or quality of "any" goods or services. *See
Holtzman v. Turza*, 728 F.3d 682, 687 (7th Cir. 2013) (asking "what part of 'any'
[the defendant] finds hard to understand" in rejecting argument that fax was not an
advertisement because it was "primarily" informational). The Fax that PDR
Network sent Carlton & Harris meets that minimal standard.

In sum, the Court should reverse the district court's dismissal based on the
plain language of the statutory definition of "unsolicited advertisement" and
remand for further proceedings.

## II.    If the Court finds the statute ambiguous, then the district court should be reversed under the remedial-statute doctrine, which PDR Network does not meaningfully address.

Although Carlton & Harris's Opening Brief argued that the statute
unambiguously covers the Fax in this case, it also argued that if the Court finds the
statute ambiguous as to whether faxes offering free goods or services are
"advertisements," as the dissent concluded in *Carlton & Harris Chiropractic, Inc.
v. PDR Network, LLC*, 883 F.3d 459, 472 (4th Cir. 2018) ("*PDR Network II*")
(Thacker, J., dissenting), then the Court should resolve that ambiguity in Carlton &

Harris's favor because the TCPA is a "remedial statute" designed to protect fax recipients, not fax senders. (Carlton & Harris Br. at 11). Carlton & Harris cited this Court's decision applying this maxim in a non-TCPA case in *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 393 (4th Cir. 2014). (*Id.*) Carlton & Harris also cited three circuit court of appeals decisions specifically applying the remedial-statute doctrine to interpret ambiguous provisions of the TCPA in favor of the plaintiffs. (*Id.* (citing *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847 F.3d 92, 96 (2d Cir. 2017) ("*Boehringer*"); *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 967 (7th Cir. 2020) ("*A-S Medication*"); *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir. 2013)).

    PDR Network does not dispute that § 227(b)(1)(C) of the TCPA is a "remedial statute" within the meaning of *Russell* and the other circuit authorities cited in Carlton & Harris's brief. (PDR Br. at 46, n.7). PDR Network does not cite or discuss this Court's decision in *Russell*. (*Id.*) PDR Network's only response to this argument is contained in a single footnote, stating that "civil procedure rules, not the 'remedial' or 'nonremedial' nature of a statute, determine whether a complaint's allegations are sufficient to survive a motion to dismiss." (*Id.*)

    By burying this response in a footnote, PDR Network has forfeited the argument. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 n.8 (4th Cir.

2015) (concluding that a party waives an argument when its discussion of that argument is limited to an isolated footnote). But PDR Network's argument also misses the point on the merits. Carlton & Harris is not arguing that the remedial-statute doctrine is used to "determine whether a complaint's allegations are sufficient," as PDR Network asserts. Carlton & Harris argues that the remedial-statute doctrine is used to resolve an ambiguity in deciding what the statute means. In other words, it is used to determine what standard the complaint must meet, not whether the complaint meets that standard.

PDR Network's footnote on this issue cites *Sandusky Wellness Ctr. LLC v. Medco Health Sols., Inc.*, 788 F.3d 218 (6th Cir. 2015), but that case is inapposite because the Sixth Circuit held the remedial-statute doctrine did not apply because the statutory definition of "advertisement" unambiguously excluded the fax at issue in that case (which did not offer free goods or services). As Carlton & Harris's brief explains, the remedial-statute doctrine applies only if the statute is ambiguous (*i.e.*, capable of more than one reasonable interpretation). PDR Network thus raises no real dispute to the proposition that, if the Court determines the statute is ambiguous as to whether faxes offering free goods or services are "advertisements," then the Court should adopt the interpretation that favors Carlton & Harris. That conclusion would require reversal in this case.

10

PDR Network argues that reading the statute to encompass faxes that advertise the "quality . . . of any good," would raise First Amendment concerns because it would then regulate "non-commercial" speech, citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563-64 (2011); *Reed v. Town of Gilbert*, 576 U.S. 155, 159 (2015); *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (plurality). (Resp. Br. at 32). But the speech at issue in this case is unavoidably "commercial" because, as the First Amended Complaint alleges, PDR Network is paid by the pharmaceutical companies to distribute the 2014 eBook and "the amount of money [PDR Network] receives turns on how many copies of the *Physicians' Desk Reference* it distributes," which the Court found was a reasonable inference in *PDR Network II*, 883 F.3d at 468. (A018, ¶ 20). PDR Network was therefore engaged in commercial speech when it sent the Fax, and the Fax "relates to" PDR Network's selling of its services to the pharmaceutical companies.

Finally, Section 227(b)(1)(C) is also subject to intermediate scrutiny because it does not prevent any speaker from communicating any particular message to any potential recipient. Rather, § 227(b)(1)(C) merely regulates the manner of sending that message: it regulates one method (by fax) in one particular circumstance (when the fax is unsolicited). Accordingly, § 227(b)(1)(C) constitutes a content-neutral time-place-manner regulation of commercial speech. This provides a

second and independent reason why § 227(b)(1)(C) need only satisfy intermediate scrutiny. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

In sum, even if the Court finds the statute ambiguous as to whether PDR Network's Fax offering the 2014 eBook is ambiguous, it should reverse under the remedial-statute doctrine.

## III.    If the Court finds the statute ambiguous, it should defer to the FCC's 2006 Order and reverse.

Carlton & Harris argued in its Opening Brief that, if the Court finds the statute ambiguous as to whether faxes offering free goods or services are advertisements, it should defer to the FCC's conclusion that such faxes are "presume[d]" to be advertisements in *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, Junk Prevention Act of 2005*, 21 FCC Rcd. 3787, 3814, ¶ 52 (FCC Apr. 6, 2006) ("2006 Order"). (Carlton & Harris Br. at 14–16).

PDR Network argues the free-goods-or-services rule is not subject to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), on the basis that it is "inconsistent with a series of other Commission rulings and statements." (Resp. Br. at 36). PDR Network points to FCC rulings from 2003, 2005, and 2007 regarding certain types of robocalls. (*Id.* at 36–39).

PDR Network's reliance on FCC robocall rulings is misplaced because, as the FCC made clear as amicus in *Palm Beach Golf Center-Boca, Inc. v. Sarris*, 781 F.3d 1245 (11th Cir. 2015), "[s]eparate subsections of [the TCPA] address voice

12

telephone calls and facsimile advertisements," those subsections "contain different language," and the "FCC rules implementing those provisions treat voice calls and faxes differently." FCC Amicus Br., *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, No. 13-14013 (11th Cir.), at 2014 WL 3734105, at *1 (July 17, 2014). "Because facsimile advertisements were not at issue in" the portions of the FCC rulings upon which PDR relies, "the FCC had no occasion to opine on" whether a facsimile offering free goods or services is an advertisement. FCC Amicus Br., 2014 WL 3734105, at *5. The agency did not reach that issue until the 2006 Order, which this Court concluded in *PDR Network II* is "clear and unambiguous" in ruling that "faxes that offer free goods and services are advertisements under the TCPA." 883 F.3d at 466–67. There is no inconsistency between the free-goods-or-services rule and the FCC's earlier robocall rulings.

PDR Network relies heavily on the FCC enforcement decisions in the *Presidential Who's Who* matter (which involved fax advertisements) to argue that the free-goods-or-services rule is not a "per se" rule, but instead requires a pretext *in fact*. (Resp. Br. at 10–11, 41–42). The *Presidential Who's Who* decisions actually support Carlton & Harris's position. Although the FCC found that the faxes at issue were in fact a pretext to future efforts to sell the Who's Who publication to persons who provided their information for the publication, the agency made clear that the 2006 Order "[m]ore broadly" stated that faxes offering

13

free goods or services "are unsolicited advertisements," regardless of whether they are a pretext in fact. *In re Presidential Who's Who DBA Presidential Who's Who, Inc.*, 25 FCC Rcd. 13759, 13762 n.20 (FCC Sept. 13, 2010). The FCC had no occasion to rule "more broadly" by applying the per se rule in *Presidential Who's Who* because there was an evidentiary record showing that the faxes were in fact pretextual. *Id.*

In any case, the Court need not even apply the per se rule in this case because there is also a plausible pretext *in fact* here. The Fax explicitly states that recipients will in the future receive additional "information about healthcare products and services from PDR via fax" if the recipient fails to "opt-out of delivery" of such faxes. (A031). That language is analogous to cases where the fax invites recipients to attend a free seminar, but requires as a precondition that recipients agree to receive future promotional faxes. *See, e.g.*, *Am.'s Health & Res. Ctr., Ltd. v. Promologics, Inc.*, No. 16-CV-9281, 2017 WL 5001284, at *1 (N.D. Ill. Nov. 2, 2017); *N. Suburban Chiropractic Clinic, Ltd. v. Merck & Co.*, No. 13-CV-3113, 2013 WL 5170754, at *2 (N.D. Ill. Sept. 13, 2013), *cited in Ambassador Animal Hosp., Ltd. v. Elanco Animal Health, Inc.*, No. 20-CV-2886, 2021 WL 633358, at *4 (N.D. Ill. Feb. 18, 2021)); *see also Comprehensive Health Care Sys. of the Palm Beaches, Inc. v. M3 USA Corp.*, 232 F. Supp. 3d 1239, 1242–43 (S.D. Fla. 2017) (denying motion to dismiss where fax asked recipients to register to take

a survey, and defendant's privacy policy stated defendant "may target advertising and marketing based upon information provided by a potential participant during the registration process"); *Advanced Dermatology v. Fieldwork, Inc.*, No. 19 CV 05821, 2021 WL 3077663, at *6 (N.D. Ill. July 21, 2021) (fax asking recipients to take a market-research survey was plausibly pretext to future advertising where defendant's privacy policy stated survey takers agreed that defendant may send announcements "of the latest news, products, and availability of upcoming research products," including "marketing or promotional materials").

PDR Network argues these cases are distinguishable because they stand only for the proposition that "where a fax sender *requires* a recipient of a free seminar invitation to *opt in* to future marketing faxes in order to accept [the] free seminar invitation," the fax may plausibly be a pretext to future advertising, but the Fax in this case required recipients to "opt-out" of future faxes. (Resp. Br. at 50 (citing *Ambassador Animal Hosp.*, 2021 WL 633358, at *4)). That makes the case for a pretext here *stronger*, not weaker, because PDR Network is "presum[ing] consent unless advised otherwise." (2006 Order, 21 FCC Rcd. at 3811 n.168 (rejecting this type of "negative option" for obtaining prior express permission to send fax advertisements); *A-S Medication*, 950 F.3d at 965 (recognizing that negative option is impermissible). Requiring a fax recipient to affirmatively *opt in* to receiving future fax advertisements for "healthcare products and services" is less

burdensome on consumers because if they do nothing, they will not receive future faxes; requiring a fax recipient to *opt out* of receiving future faxes advertisements for "healthcare products and services" is more burdensome because if consumers do nothing in response, they will receive such future faxes.

In sum, even if the Court finds the statute ambiguous as to whether faxes offering free goods or services are "advertisements," it should defer to the FCC's 2006 Order and reverse the district court.

## <u>Conclusion</u>

For the foregoing reasons, the Court should reverse the district court's dismissal for failure to state a claim and remand for further proceedings.

Date:  July 22, 2022                    Respectfully submitted,

                                        CARLTON & HARRIS
                                        CHIROPRACTIC, INC.

                                        /s/Glenn L. Hara
                                        Glenn L. Hara
                                        Anderson + Wanca
                                        3701 Algonquin Road, Suite 500
                                        Rolling Meadows, IL  60008
                                        Telephone:  (847) 368-1500
                                        Facsimile:   (847) 368-1501
                                        ghara@andersonwanca.com

                                        D. Christopher Hedges
                                        Caldwell Luce diTrapano
                                        500 Randolph St.
                                        Charleston, WV  25302

Telephone:  (304)-343-4323
Facsimile:  (304)-344-3684
chedges@cldlaw.com

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _____    Caption: _____

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[  ]  this brief or other document contains _____ [*state number of*] words

[  ]  this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[  ]  this brief or other document has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

[  ]  this brief or other document has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s)_____

Party Name_____

Dated:_____

04/12/2020  SCC